**William McQUEEN et al., Plaintiffs, Appellees,**

v.

**Bertram DRUKER et al., Defendants, Appellants.**

**No. 7726.**

United States Court of Appeals, First Circuit.

Feb. 24, 1971.

Robert J. Sherer, Boston, Mass., with whom Thomas D. Garvin Jr., and Michael Putziger, of Roche, Carens & DeGiacomo, Boston, Mass., were on brief, for appellants.

Michael L. Altman and Brian Michael Olmstead, Dorchester, Mass., for appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Appellees are tenants in a 500 unit apartment complex, Castle Square, in the South End of Boston—the same subsidized housing facility constructed and operated under section 221(d) (3) of the National Housing Act, 12 U.S.C. § 1715*l*(d) (3), which was involved in Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970). This suit originated when appellant landlord,[1] in accordance with the terms of the lease, notified these tenants in May, 1970, that it was not to be renewed after the July 31, 1970 termination date. Appellees brought this action under 42 U.S.C. § 1983, asserting jurisdiction under 28 U.S.C. §§ 1331, 1343, and seeking an injunction against their threatened eviction; a declaration that eviction must be predicated on cause, with notice, hearing and assurance of alternative housing; and compensatory and punitive damages.[2]

The district court found sufficient federal and state involvement to make applicable the due process clauses of the Fifth and Fourteenth Amendments and the First Amendment. It enjoined the eviction, and made two declarations of rights and responsibilities. First, it declared that the statutory scheme for § 221(d) (3) housing impliedly requires a good-cause notice to evict and that state court proceedings, observing this substantive federal ruling, would provide procedural due process. Second, it declared that, since "the chief reason" for the landlord's notice to quit was "associational activities" on behalf of fellow tenants, petitions to the Federal Housing Authority, and litigation, the First and Fourteenth Amendments barred any eviction so grounded. 317 F.Supp. 1122 (D.Mass. 1970).

The large problem for us is whether the landlord's action in exercising his contractual right under the lease not to renew and in seeking to evict appellees, can rationally be said to be such "state action" as to call into play the Fourteenth Amendment.[3] More precisely, the question is whether the landlord, though not an ostensible agent of the state, has such a relationship with the state that his activities take on the color of state law. United States v. Price, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). The district court, relying on Colon v. Tompkins Square Neighbors, 294 F.Supp. 134 (S.D. N.Y.),[4] as well as on Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S. Ct. 856, 6 L.Ed.2d 45 (1961), and Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), reasoned that "With respect to Castle Square, the federal and state governments have elected to place their power, property, and privilege behind the landlords' authority over the tenants, and have insinuated themselves into a position of interdependence with the landlords."

The landlord claims that this case involves only "a regulation of the operations of a private business, not a vesting in it of the functions of government" and argues, citing Grossner v. Trustees of Columbia University in the City of New York, 287 F.Supp. 535, 548 (S.D.

---

1. During the pendency of this litigation one of the two named landlord-defendants died. We shall therefore refer to the sole appellant as "landlord" as a matter of convenience.

2. The landlord's subsequent eviction action, by agreement, awaits final resolution of this appeal.

3. We base this decision on state, not federal involvement, the former being the only issue argued on appeal by appellees.

4. This case dealt with very similar facts. We do not feel that *Colon* is inconsistent with the subsequent Second Circuit case, McGuane v. Chenango Court, Inc., 431 F.2d 1189 (1970), which seems to hold only that mere receipt of mortgage insurance under the National Housing Act does not make a private apartment house owner an agency of a state. With this proposition we of course agree as our discussion indicates.

N.Y. 1968), that "the receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government". He attacks the court's finding in the words of Mr. Justice Harlan's dissent in *Wilmington Parking Authority, supra,* 365 U.S. at 727, 81 S.Ct. at 862, as the result of "undiscriminatingly throwing together various bits and pieces". We do not agree. Our scrutiny of the landlord-state relationship indicates far less privateness in the landlord's enterprise, far more of a governmental function, and "a good deal more" than receipt of governmental financial help. They are inescapably the "bits and pieces" on which an ultimate judgment must rest after "sifting facts and weighing circumstances", *Wilmington Parking Authority, supra,* 365 U.S. at 722, 81 S.Ct. 856. We concede that little guidance in making a principled decision is found in such serpentine words as "insinuated", *Wilmington Parking Authority, supra,* 365 U.S. at 725, 81 S.Ct. 856, "involved", Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), "entwined", Evans v. Newton, 382 U.S. 296, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), or "intertwining", *Grossner, supra,* 287 F.Supp. at 548. Commentators have varied in approving or disapproving this lack of precision, but all have recognized it.[5] Recognizing that the state coloration required by § 1983 is inevitably opaque, we nevertheless hazard our analysis.

Defendant purchased the Castle Square property from the Boston Redevelopment Authority (BRA), which had condemned it in connection with its urban renewal program. The federal incentive to private entrepreneurs, inducing them to take part in helping achieve the national objective of providing housing for needy and displaced families, is insurance of mortgage loans up to 90 per cent of a project's cost, supplementation of mortgagors' interest payments above 3 per cent, and assurance of a 6 per cent return on investment through rent adjustments. In addition to limiting the exposure of private enterprise, the federal law imposes requirements which must be adopted by participating states. For example, federal law requires that, in disposing of urban renewal property, the BRA must place restrictions on the use of property in order to ensure that it is used in accordance with approved urban renewal plans or for low or moderate income housing. 42 U.S.C. §§ 1460(c) (4), 1455, and 1457. State law requires similar restrictions. Mass.Gen.Laws ch. 121, §§ 26YY and 26 LL.

Consequently, the BRA has required the landlord through a lengthy Land Disposition Agreement to adhere to many standards governing the physical plant (*e.g.,* prior approval for construction, improvements and demolition, a minimum investment in works of art, facilities for the handicapped, equal employment opportunity); limitations on rental agreements as to amount, duration, and increases; admissions policies (*e.g.,* income levels of applicants, priority to four classes of displaced persons and four classes of commercial occupants, and allowing the Boston Housing Authority to select tenants for 10 per cent of the residential units);[6] manage-

---

5. The commentary might be broadly grouped into articles which decry the indefiniteness of the concept; *e. g.,* Lewis, Burton v. Wilmington Parking Authority —A Case Without Precedent, 61 Colum. L.Rev. 1458 (1961), Note, The Distintegration of a Concept—State Action Under the 14th and 15th Amendments, 96 U.Pa.L.Rev. 402 (1948) ; articles which would jettison the concept and seek an appropriate substitute for it; *e. g.,* Horowitz, The Misleading Search for "State Action" Under the Fourteenth Amendment 30 S.Cal.L.Rev. 208 (1957), Van Alstyne & Karst, State Action, 14 Stan.L.Rev. 3 (1961) ; and articles which find merit in the concept's open-endedness only as second choice to its demise as a restriction on the 14th Amendment; *e. g.,* Black, "State Action", Equal Protection, and California's Proposition 14, 81 Harv. L.Rev. 69 (1967).

6. By subsequent agreement between the landlord and the BHA this commitment was raised to a maximum option of 25%

ment (*e.g.*, use solely in accordance with the South End Urban Renewal Plan, consultation with BRA "with respect to its rental program, including preparation of advertising matter, brochures, leases, establishment of rental offices, and all aspects of said program which relate to or have an effect upon the selection of tenants", inspection at all reasonable hours); transfer of title (*e. g.*, compliance with any "conditions * * * the Authority may find desirable in order to achieve and safeguard the purposes of the Massachusetts Housing Authority Law, and the Plan.").

The state supervision of the "private" operations here seems to us to be more than the placing of state "power, property and prestige" behind the discriminatory action of a private restaurateur-lessee in a public building. Burton v. Wilmington Parking Authority, *supra*, 365 U.S. at 725, 81 S.Ct. 856. Here the landlords are, in return for an assured consideration, and subject to specific and continuing oversight, helping the state realize its specific priority objective of providing for urban renewal displacees and its more general goal of providing good quality housing at rents which can be afforded by those of low and moderate income. The stronger posture of government supervision present in this case is not unrelated to the fact that the government has chosen to attract the participation of private persons in carrying out a specific governmental purpose. In Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed. 2d 373 (1966), the Court held that a park, serving the community and having a municipal purpose, could not be insu-

lated from the effect of the Fourteenth Amendment by transfer of title to private trustees.[7] It also observed that "If the municipality remains entwined in the management and control of the park, it remains subject to the restraints of the Fourteenth Amendment just as the private utility in Public Utilities Comm'n v. Pollak, 343 U.S. 451, 462, [72 S.Ct. 813, 96 L.Ed. 1068], remained subject to the Fifth Amendment because of the surveillance which federal agencies had over its affairs." 382 U.S. at 301, 86 S.Ct. at 489. Here the function, while perhaps not so traditionally governmental as parks, fire or police services, or libraries, is today one of the major concerns of most cities of substantial size. And to the performance of that function by the landlord, governmental authority contributes significant operational surveillance.

■ ■ We view our task of "sifting facts and weighing circumstances" as one to be done to the end of determining when it is fair and reasonable to hold an individual subject to the same duties of observance of constitutional rights as are imposed on a governmental unit. Mere receipt of financial subsidy and subjection to some regulation are the conditions of much of our societal life. Neither factor—or both together—is dispositive of "state action". But, while we disavow any effort to be definitive, we conclude that at least when a specific governmental function is carried out by heavily subsidized private firms or individuals whose freedom of decision-making has, by contract and the reserved governmental power of continuing oversight, been circumscribed substantially

as part of the BHA's leased housing program, under which the BHA guarantees rental payments. In addition, the City of Boston has granted the landlord a concessionary tax rate of 15% of income. Both these arrangements decrease the landlord's risk of non-payment of rents, the former by assuring the landlord of at least 25% of his rents each month without recourse to collection efforts, and the latter by pegging his tax obligations to rents actually received. Although the regulatory agreement with the FHA as-

sures the landlord a 6% return, altering the rent schedules to produce such a return necessarily involves some delay. The arrangements with the BHA and the City therefore act to ease the financial shock sustained during this required lead time.

7. *See also* Kerr v. Enoch Pratt Free Library of Baltimore City, 149 F.2d 212 (4th Cir. 1945), and Derrington v. Plummer, 240 F.2d 922 (5th Cir. 1956).

more than that generally accorded an independent contractor, the coloration of state action fairly attaches.[8]

This brings us to the implications of the applicability of the Fourteenth Amendment to the landlord's pending action to evict appellees. Appellant's burden is to establish that the district court's finding was clearly erroneous. We have examined the record and find abundant evidence supporting the district court's determination. The appellant distributed a flyer to all tenants announcing his intention to evict the appellees including as a reason "the many confrontations * * * with the McQueens" as compelling his actions. The manager of Castle Square in his testimony admitted telling the appellees' counsel that the conflict with the McQueens had become a "cause celebre" and that the landlord could not tolerate being confronted. The appellant did not deny that his motive was retaliatory at least in part. He presented in addition a panoply of alternate reasons for the eviction, all of which had been unsuccessfully tendered previously in state eviction proceedings against the McQueens. The court was well within its bounds to discount these grounds and find the dominant and primary motive one of retaliation against the appellees for their exercise of First Amendment rights. Cf. NLRB v. Billen Shoe Co., 397 F.2d 801 (1st Cir. 1968). This established, it must follow that, whatever other rights or privileges may be available, appellees are at least protected from this eviction.[9]

The appellees in addition request a further declaration that the Castle Square landlord may not evict a tenant without giving notice of good cause for the eviction accompanied by a hearing thereupon in order to satisfy due process. Because of our disposition of this appeal on the grounds stated above, we do not have to reach this latter question.[10] As far as this tenant is concerned, the landlord may not evict him for holding over after termination of his lease because, as found by the district court, the eviction was brought because of the exercise by the tenants of their First Amendment Rights. The procedural rights of a tenant whose eviction is not motivated by constitutionally impermissible reasons is not presented by this appeal. Furthermore, we doubt whether any "case or controversy" is involved when a tenant requests a declaration of procedural rights as to an imagined future eviction which has never been threatened. The Declaratory Judgment Act requires more concreteness than this. Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L. Ed. 617 (1937); 6A Moore ¶ 57.12. Finally, while Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1968), laid down the procedural rights of tenants in wholly public housing proj-

8. Compare Powe v. Miles, 407 F.2d 73 (2d Cir. 1968), where in an interesting juxtaposition of cases, the court held that disciplinary action against students in the Liberal Arts College of Alfred University was held not to be under color of state law, while similar action against students of the state-controlled New York State College of Ceramics on the same campus was held to be state action. Our instant case falls between the two, but closer to the second.

9. Indeed, the particular activity engaged in by appellees is within the spirit if not the letter of the Massachusetts law giving a tenant a right of action against a landlord "who threatens or takes reprisals * * * for reporting * * * a suspected violation of any health or building code or of any other municipal by-law or ordinance, or state law or regulation which has as its objective the regulation of residential premises * * *." Mass.Gen.Laws Ch. 186, § 18. Cf. also Edwards v. Habib, 130 U.S.App.D.C. 126, 397 F.2d 687 (1968).

10. Appellant has protested a ruling of the district court refusing to reopen the record to receive evidence which, so far as we can see, was within the power of appellant to present earlier. The evidence bore on only one of a number of facts relating to appellant's motives. The ruling of the court was well within its discretion.

ects as a result of non-constitutional analysis, we are disinclined to attempt to define any additional constitutional rights of tenants in a § 1983 case in the absence of a more real crucible of controversy.

The judgment of the district court is affirmed insofar as it enjoins appellant from proceeding further with respect to his May 20, 1970 notice of termination of the McQueen tenancy and with respect to the proceedings for eviction of the McQueens which appellant began in the Boston Municipal Court on August 31, 1970.