Patricia MALE et al., Appellees,

v.

CROSSROADS ASSOCIATES et al.,
Appellants.

No. 88, Docket 72–1065.

United States Court of Appeals,
Second Circuit.

Argued Oct. 17, 1972.

Decided Nov. 10, 1972.

Barry I. Fredericks, New York City (Stein & Fredericks, New York City, on the brief), for appellants.

Martin A. Schwartz, White Plains, N. Y. (John T. Hand, The Legal Aid Society of Westchester County, White Plains, N. Y., on the brief), for appellees.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We have witnessed recently a burgeoning increase in the number of instances this court has been asked by recipients of public assistance to resolve disputes involving alleged denials of their fundamental rights. This case requires us to again intervene in such a controversy. Plaintiffs, all welfare recipients residing in Peekskill, N. Y., allege that rental agents at the Crossroads Apartments, a privately owned complex built by David and Muriel Bogdanoff as part of the Peekskill Urban Renewal Project, refused to consider them as applicants for housing solely because of their welfare status. This refusal, they claim, was an arbitrary and invidious discrimination violative of rights secured to them by the Equal Protection Clause of the Fourteenth amendment. Judge Tenney agreed and granted summary judgment against ment of Housing and Urban Develop-Crossroads and its owners, ordering permanent injunctive relief. Because we believe that the pervasive state involvement in the origins, development, and continued activity of the Crossroads requires that its practices be judged by the dictates of that Amendment, we conclude that the classification scheme employed by the Bogdanoffs may not continue. Accordingly, we affirm.

## I. THE FACTUAL SETTING

### A. The Peekskill Urban Renewal Project

A full understanding of the factual background of this litigation will be helpful at the outset. In the early 1960's, officials of the City of Peekskill, like those of many other urban communities in the nation, realized that the rapidly deteriorating condition of the city would require a massive recovery effort to avert total blight. Accordingly, Peekskill began development of an urban renewal plan designed to take advantage of available state and federal funding. After the plans had begun to take shape, the Peekskill Urban Renewal Agency was created by the New York legislature in 1964. The Agency, which consists of the Mayor and the six Common Council members of Peekskill, entered into capital grant contracts with the United States Housing and Home Finance Administration (now the Department of Housing and Urban Development) and the New York State Division of Housing and Community Renewal. The basic intention was to replace dilapidated structures which had outlived their usefulness with new commercial and residential buildings designed to revitalize the downtown area. The statutory scheme provided that the net project cost—the total dollar amount expended to acquire and prepare the site less proceeds from the sale of acreage to private developers—would be funded two-thirds by the federal government and one-third by state and local agencies. See 42 U.S.C. §§ 1441 et seq.; N.Y.Gen.Mun. Law Art. 15 & 15A (McKinney's Consol.Laws, c. 24, 1965). The actual acquisition of the land was effectuated by exercise of Peekskill's power of eminent domain. See 42 U.S.C. § 1460(c); N.Y. Gen.Mun.Law §§ 554(6), 555 (McKinney 1965).

A vital part of the Peekskill plan, known as the Academy Street Renewal Project, was the construction of middle income apartment residences. The plan contemplated that the construction and

ownership of this housing would be undertaken by a private developer. Accordingly, on November 25, 1968, the Agency, acting on behalf of the city, entered into a contract with Crossroads Associates, a partnership organized by David and Muriel Bogdanoff. The contract provided that Crossroads would pay $182,100 for two parcels of land in the Academy Street Project area. Crossroads bound itself to use the land in accordance with the renewal plan at least until 1990. The Agency undertook to demolish and remove any structures on the property, remove any existing streets, fill, grade and level the land, construct new streets and sidewalks, install all necessary utilities, and provide parking facilities at its own expense. Moreover, the Agency assumed the cost of relocating those persons displaced by the project. *See* 42 U.S.C. § 1455(c); N.Y. Gen.Mun.Law §§ 503(i), 505(4)(e) (McKinney 1965).

In addition to these specific provisions, the entire project was governed by a phalanx of state and federal regulations. *See, e. g.,* 42 U.S.C. §§ 1441 et seq.; HUD Urban Renewal Handbook; N.Y.Gen.Mun.Law Art. 15 & 15A (McKinney 1965). These regulations are designed to insure that the private developer proceeds in accordance with general standards set for urban renewal projects and with the specific renewal plan of the community. Thus, a provision of the contract provided that Crossroads shall "Devote the Property to, and only to and in accordance with, the uses specified in the Urban Renewal Plan." And, the agreement prohibited Crossroads from "discriminat[ing] upon the basis of race, color, creed, or national origin in the sale, lease, or rental or in the use or occupancy of the Property or any improvements erected or to be erected thereon, or any part thereof." These covenants were made binding on any successors in interest and the Agency and the United States were deemed beneficiaries, with the right to institute appropriate legal enforcement actions "for the purposes of protecting the interests of the community and other parties, public or private, in whose favor or for whose benefit such agreements and covenants have been provided."

After execution of this contract, planning continued and on February 21, 1969, a portion of the land was deeded to Crossroads by the Agency. Construction plans called for approximately 275 apartment units and by July, 1970, three buildings had been completed and were open for rental.

## B. *The Plaintiffs' Inquiries at the Crossroads*

The events giving rise to this action occurred in July 1970. Each of the plaintiffs went to the rental office at the Crossroads to apply for an apartment vacancy. On each occasion the rental agent, upon being informed that the applicant was a welfare recipient, refused to provide her with an application form.[1] The explanation for this refusal proffered by the Bogdanoffs was that the standard shelter allowances paid to Peekskill welfare recipients by the Westchester County Department of Social Services was less than the corresponding rentals at the Crossroads apartments.[2] The Bogdanoffs, understandably concerned with a prospective tenant's ability to pay the monthly rental, considered

---

[1]. Patricia Male, a Caucasion with two children, was told that Crossroads did not rent apartments to welfare recipients. Linda Murray, a Negro with three children, was informed that the City did not allow Crossroads to rent apartments to welfare recipients. Lillian Horne, a Negro with one child, was told that Crossroads had an agreement with the City not to rent apartments to welfare recipients. Mary McDowell, a Negro student, was informed that Crossroads did not rent to either welfare recipients or students. A fifth woman, Rose Sherroll, also was denied an application form during July. Although named as a plaintiff in the complaint, her claim was dismissed by stipulation on December 17, 1970.

[2].

| Apartment Size | Shelter Allowance | Crossroads Rent |
|---|---|---|
| Studio | $135 | $145 |
| One Bedroom | $140 | $155–$183 |
| Two Bedroom | $170 | $199–$203 |

this differential sufficiently substantial to justify not giving consideration to welfare recipients as potential tenants.

The documents submitted to Judge Tenney, however, reveal that the Westchester County Department of Social Services was authorized to pay excess shelter allowances where appropriate. Department procedures authorized these excess allowances where a recipient's standard allowance was insufficient to secure adequate housing. In such instances, the recipient was required first to locate suitable housing and then to request a caseworker to complete a special document, known as Form 664, to facilitate further processing of the request. After initial screening by the Department's local office, the request was forwarded to the Department of Social Services main office located in White Plains for final action. Because of the shortage of adequate low-income housing in Peekskill and other communities in Westchester County, almost all of these requests were approved by the main office.

But advance approval of an excess shelter allowance prior to seeking an application form at the Crossroads was not possible. According to the deposition of John Allen, Director of the Division of Family and Child Social Services, annexed to the plaintiffs' motion for summary judgment, the Department of Social Services could process a Form 664 request only when a welfare recipient requested an excess allowance for the rental of a specific apartment that a landlord was ready to make available to the applicant. Before such an allowance could be authorized, the case worker and her superiors had to know the general condition of the available apartment, the number of rooms, what utilities were included in the rent, whether a security deposit was required, and whether a written lease was available. In short, it was necessary for a recipient to have "a concrete offer for a specific apartment in the Crossroads" before the Department of Social Services would consider a Form 664 excess shelter allowance.

We observe, therefore, that the plaintiffs were trapped in a vicious circle. The Department of Social Services could not authorize an excess shelter allowance until a specific apartment was available, but the Bogdanoffs refused to even accept an application from a welfare recipient because of the inadequacy of the standard shelter allowance. Accordingly, the plaintiffs sought relief from this Catch-22 dilemma in the courts.

C. *The Proceedings Below*

The instant action was commenced by the plaintiffs on August 13, 1970, "on their own behalf and on behalf of all others similarly situated." Jurisdiction was grounded in 28 U.S.C. § 1343 and the complaint sought injunctive, declarative, and monetary relief pursuant to 42 U.S.C. §§ 1981, 1982, 1983, and 1985. It named as defendants Crossroads Associates, David and Muriel Bogdanoff, the City of Peekskill, the Peekskill Urban Renewal Agency, and Michael J. DiBart, who was Mayor of Peekskill and Chairman of the Agency. The complaint asserted that the Bogdanoffs intentionally refused to consider welfare recipients as potential tenants and that this practice, allegedly in furtherance of an agreement among the Bogdanoffs and the municipal officials, violated the Fourteenth Amendment.

On February 11, 1971, plaintiffs moved for summary judgment before Judge Tenney.[3] This was followed

3. An earlier motion for a preliminary injunction was denied by Judge Wyatt on December 3, 1970, 320 F.Supp. 141. He also denied a motion pursuant to F.R.Civ. P. 23(c)(1) for an order designating the suit a class action. Although argued on appeal by the parties, the correctness of this order is not properly before us. Because trial of the plaintiffs' claims against the municipal defendants remains, the order denying class action status is not a reviewable order, see F.R.Civ.P. 54(b), absent extraordinary circumstances not present here. *Compare* Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966), cert. denied, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967) (appellate review is not proper where

on February 16 by a similar motion by Crossroads and the Bogdanoffs, and on April 1, the remaining defendants also moved for summary judgment. After considering the affidavits and depositions submitted by the parties, Judge Tenney granted the plaintiffs' motion for summary judgment against Crossroads and the Bogdanoffs[4] and permanently enjoined the charged improper conduct.[5] Because the affidavits indicated a genuine factual dispute over the responsibility of Peekskill, the Agency, and DiBart, summary judgment was denied against them. This appeal is taken by Crossroads and the Bogdanoffs from the order granting permanent injunctive relief. 28 U.S.C. § 1292(a)(1).

## II. STATE ACTION

■ Our initial inquiry in this appeal must be directed at the crucial jurisdictional issue—was the conduct of Crossroads and the Bogdanoffs sufficiently infused with "state action" as to support jurisdiction of a claim under 42 U.S.C. § 1983 and the Fourteenth Amendment? Prior experience has demonstrated that "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). Having conducted such an examination of the record, we conclude that the Crossroads project was pervaded with state action.

The state's involvement in the development of Crossroads dates to the very origins of the Academy Street Renewal Project. The Project was conceived by Peekskill officials and it was their detailed planning that led to the creation of the Peekskill Urban Renewal Agency. Although the Bogdanoffs argue that the existence of state action is refuted by the use of private capital to erect the actual apartment building structures, this ignores the large contribution made by the state and federal governments prior to the construction. As we have noted, the Agency had acquired the land by exercise of the power of eminent domain and had borne the cost of relocating the tenants in any existing structures. Furthermore, the contract with Crossroads obligated the Agency to demolish any existing structures on the development site, remove all existing pave-

denial of class action status does not sound "death knell" to the action).

4. Judge Tenney held that Judge Wyatt's order denying a preliminary injunction was not the "law of the case." Although this determination as such is not challenged on appeal, the defendants offer the novel contention that summary judgment may not be approved because the conflicting conclusions reached by Judges Wyatt and Tenney conclusively establish that there were genuine issues as to material facts. Although this argument seems interesting at first blush, it is lacking in merit. Where the record consists entirely of documentary evidence—exhibits, affidavits, answers to interrogatories, and depositions—we are as competent as the district court to determine if a genuine factual dispute exists. Moreover, defendants' argument, if accepted, seemingly would preclude an appellate court from affirming an order granting summary judgment except by unanimous vote, a proposition we find untenable, for one

dissenting vote would indicate a "genuine issue."

5. Judge Tenney's order states
that defendants Crossroads Associates, David Bogdanoff and Muriel Bogdanoff and their officers, agents, servants, employees, be and hereby are enjoined from denying plaintiffs accommodations in "The Crossroads" on the basis of their status as welfare recipients; and it is further
Ordered, that defendants Crossroads Associates, David Bogdanoff and Muriel Bogdanoff offer plaintiffs applications for housing accommodations at "The Crossroads" upon the same terms and conditions as are applicable to all other persons who are not recipients of public assistance; and it is further
Ordered, that if applications are thereafter submitted by plaintiffs, said applications are to be considered by defendants upon the same terms and conditions as are applicable to all other persons who are not recipients of public assistance.

ments and utilities, fill, grade, and level the land, and install new streets, sidewalks, and utilities in accordance with the plans submitted by Crossroads. In sum, Crossroads was presented with a fully prepared site upon which construction immediately could commence in return for only $182,100—the balance of the very substantial project cost being borne by the state and federal governments.

Under similar circumstances, the Supreme Court has concluded that a private enterprise was permeated with state action. In Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), a private restaurant situated in a municipally owned parking garage was ordered to cease discriminating against Negroes. The Court concluded that public assumption of the cost of planning, constructing, and maintaining the garage structure infused the practices of the restaurant with state action.[6]

Another case in point, Smith v. Holiday Inns of America, Inc., 336 F.2d 630 (6th Cir. 1964), involved facts almost on all fours with those in the instant appeal. Smith was concerned with a privately-owned motel that was built as part of an urban renewal project in Nashville, Tennessee. Operating under substantially the same statutory scheme, the urban renewal agency formulated the original plan, acquired and cleared the site, and deeded the acreage to Holiday under terms similar to those in the contract between Crossroads and the Peekskill Urban Renewal Agency. The Court made this pertinent observation:

> The single pervasive fact which defendants seek to ignore but which this court cannot is that this motel is part and parcel of a large, significant, and continuing public enterprise. . . . This motel was conceived by the planners of this project, its creation was made possible by the execution of the project, and its existence is now governed to a great degree by the project's predetermined design and controls.

336 F.2d at 634.

Under the circumstances presented to us, the conclusion is inescapable that Crossroads not only had a symbiotic relationship with the state, see Burton, 365 U.S. at 724, 81 S.Ct. 856, 6 L.Ed.2d 45, but owed its very existence to state action. See Smith, supra, at 634–635. For this reason, we find Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), which specifically reaffirmed the validity of Burton, to be inapposite.

■ Moreover, the pervasive regulatory scheme under which the Academy Street Project proceeded is evidence of the state's initial and continuing involvement in the construction and operation of the Crossroads. Each step of the project, from the first draft of the renewal plan to the approval of specific blueprints submitted by the private developer, was governed by a state or federal statute or rule. See generally 42 U.S.C. §§ 1441 et seq. Although the mere existence of a state or federal regulatory scheme standing alone with nothing more is not sufficient to bring those regulated within the scope of the Fourteenth Amendment, see Moose Lodge, supra, the regulation and its extent must be considered in weighing the circumstances of each case. See McCabe v. Nassau County Medical Center, 453 F.2d 698, 702–703 (2d Cir. 1971). Although we have discussed the urban renewal regulatory scheme in greater detail

---

6. In Burton, the restaurant occupied the premises under the terms of a lease rather than outright ownership. This distinction, however, is of no moment. The lease was for a term of twenty years, renewable for another ten, thus representing a long-term commitment to use of the facilities. The Bogdanoffs were bound to the covenants of their agreement with the Agency until 1990.

above, of special importance here is the state's demonstrated intention to regulate the tenant selection procedures at the Crossroads apartments as evidenced by the anti-discrimination clauses in the Crossroads-Agency agreement.

In sum, the documents submitted to Judge Tenney convincingly demonstrate a web of state involvement spun by the state in which the Crossroads project was entangled. Accordingly, the practices of the Bogdanoffs must be measured against the commands of the Fourteenth Amendment.

## III. CROSSROADS' DISCRIMINATORY PRACTICES

■ The narrow question we must now consider is whether refusal of the Bogdanoffs to even consider welfare recipients as applicants for apartment vacancies at the Crossroads denied these plaintiffs the equal protection of the laws. Although it is axiomatic that the Fourteenth Amendment does not prevent a state from imposing different treatment for different classes of persons as long as all persons similarly situated are treated alike, see, e. g., McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Railway Express Agency v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949), it is equally clear that the classifications created by the state must be rationally related to the objective sought to be achieved. See, e. g., McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed. 2d 222 (1964).

■ The Bogdanoffs argue that they apply a uniform standard in approving or disapproving rental applications: ability to pay the rent. They urge that the justification for refusing to even consider welfare recipients is that the variance between the shelter allowances and the rent schedule at the Crossroads conclusively demonstrates that persons reliant upon public assistance would be unable to pay the rents charged for the Crossroads apartments.

We agree that there is no requirement that welfare recipients, or any other individuals, may secure apartments in a development such as this without regard to their ability to pay. But it is clear that the state or its alter egos may not relegate welfare recipients to second-class citizenship solely because they receive welfare subsistence. See Holmes v. New York City Housing Authority, 398 F.2d 262 (2d Cir. 1968); Colon v. Tompkins Square Neighbors, Inc., 294 F.Supp. 134 (S.D.N.Y.1968). The seeming rational relationship between the sought-after objective—ability to pay—and the classification imposed—welfare status—fails when excess shelter allowances, which could have been available here, are considered.

[8] These allowances, routinely granted in most instances as the record indicates, would provide sufficient funds to pay the rent at the Crossroads. Yet there is no dispute in the record before us that the very refusal of the Bogdanoffs to consider applications from welfare recipients set off the merry-go-round and prevented the plaintiffs from securing excess shelter allowances. The only reasonable conclusion that can be drawn from the deposition testimony of Allen, Director of the Division of Family and Child Social Services, is that the Department of Social Services would not consider a Form 664 request for an excess shelter allowance unless a landlord was then prepared to rent a specific apartment to the applicant. Thus, initially, it is the Bogdanoffs's own conduct which prevents welfare recipients from demonstrating their ability to pay the rents charged at the Crossroads. For this reason, the record cannot demonstrate that any plaintiff applied for an excess shelter allowance or was eligible for one. The crucial fact is that such allowances were available and were usually granted. Accordingly, we cannot conclude that the classification "welfare recipients" employed by the Bogdanoffs has been drawn with the precision de-

manded by the Equal Protection Clause. See Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1971); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).[7]

Affirmed.

7. We caution, however, that our decision is not to be read as holding that Crossroads is required to rent to welfare recipients without regard to their ability to pay the rent. The remedies available when a nonwelfare tenant defaults his rental obligation would be similarly available when a tenant receiving public assistance defaults because of a reduction or elimination of the excess shelter allowance.