Narcisa LOPEZ, Plaintiff-Appellee,

v.

HENRY PHIPPS PLAZA SOUTH, INC.,
Defendant-Appellant.

No. 1043, Docket 74–1078.

United States Court of Appeals,
Second Circuit.

Argued May 30, 1974.

Decided June 18, 1974.

938

Joseph Delman, New York City (Whitehorn & Delman, New York City, of counsel), for defendant-appellant.

Nancy E. LeBlanc, New York City (MFY Legal Services, Inc. and Martin A. Hotvet, New York City, of counsel), for plaintiff-appellee.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

Defendant-Appellant, Henry Phipps Plaza South, Inc. (Phipps), is a non-profit redevelopment company organized pursuant to the New York Redevelopment Companies Law, N.Y.Priv.Hous. Fin.Law § 100 et seq. (McKinney's Consol.Laws, c. 44B 1962). It was created to build and operate a hous-

ing project for low and middle income families in New York City pursuant to the Bellevue South Urban Renewal Plan. The law provides for extensive supervision of the organization, planning and operation of redevelopment companies by New York City's Housing and Development Administration. Phipps' certificate of incorporation declares that it "has been organized to serve a public purpose"; that the Housing and Development Administration may remove any director from office if the company fails to comply with the Administration's requirements; and that Phipps shall remain subject to the Administration's supervision and control on a permanent basis. New York City acquired the land by exercise of its power of eminent domain and conveyed it to Phipps by a deed which incorporated by reference a detailed agreement, theretofore approved by the New York City Board of Estimate, with respect to the construction and operation of the project. The property enjoys a 25-year exemption from real estate taxes, other than assessments for local improvements, and so much of its value as exceeds the assessed value at the time of acquisition by the City. Phipps benefits from interest reduction payments provided in § 236 of the National Housing Act, 12 U.S.C. § 1715z–1, and participates in the federal rent supplement program, 12 U.S.C. § 1701s. Participation in a § 236 program is conditioned on the execution of a Regulatory Agreement with the Federal Housing Administration; this provides, *inter alia*, minimum and maximum rent schedules, tenant selection priorities, and other restrictions on the landlord's rental practices.

On October 1, 1970, plaintiff Narcisa Lopez and her husband Thomas Lopez entered into a lease of an apartment in the building which Phipps had constructed pursuant to its arrangements with the City and HUD. Paragraph 9 of the lease provided in pertinent part as follows:

Tenant and Tenant's family, guests, servants, employees, agents, licensees and visitors shall comply with all of the Rules and Regulations set forth at the end of this lease and such other and further rules and regulations as Landlord may hereafter from time to time deem necessary or desirable and may prescribe for the safety, care, cleanliness and reputation of the demised premises, or all or part of the Development or for the comfort and convenience of Tenant or other tenants of the Development.. Tenant and Tenant's family, guests, servants, employees, agents, licensees and visitors shall at all times conduct themselves in and about the demised premises and the Development in a manner which shall be free from annoyance to other tenants in the same or neighboring buildings or elsewhere in the Development to the end that other tenants in the same or neighboring buildings or in the Development shall enjoy the occupancy and use of their premises and their rights and privileges as tenants with reasonable comfort, convenience and safety. Failure on the part of Tenant and Tenant's family, guests, servants, employees, agents, licensees or visitors to observe any such requirements as provided in this paragraph shall be grounds for the termination of this lease in the manner herein provided . . . .

The one-year lease was renewed, apparently several times. The last renewal expired on December 31, 1972.

On January 12, 1973, Phipps addressed a letter to Mr. and Mrs. Lopez announcing that it had decided not to renew the lease again. The decision was based on thirteen alleged acts of misconduct, most of them attributed to Thomas Lopez, Sr., and the two teen-age sons, Thomas, Jr., and Jose. The letter advised that the tenants could appeal the decision by written request within 15 days. If they sought review, the letter stated, they could ask for a hearing at which they might be represented by an attorney and have witnesses present. In

the absence of a request for a review or in the event of an affirmance of the initial decision, summary proceedings for eviction would be instituted.

Through an attorney, Mr. and Mrs. Lopez requested a hearing, which was scheduled for February 27, 1973. The hearing officer was John Codman, Manager of Lambert Houses, a similar project of a non-profit corporation whose stock is owned by Phipps Houses, Inc., a non-profit organization that also owns the stock of the defendant Phipps. At the request of an attorney from MFY Legal Services, Inc., the hearing was adjourned to enable Mrs. Lopez to obtain the services of a Spanish-speaking interpreter. The hearing was resumed on March 6; Mr. and Mrs. Lopez and Thomas, Jr., were present, along with an attorney from MFY Legal Services, who stated that she represented only Mrs. Lopez. Four security guards and a superintendent testified on the behalf of the landlord with regard to various charges against the Lopez family. Thomas Lopez, Sr., testified at the hearing, but Mrs. Lopez and Thomas, Jr., declined to do so. At the conclusion of the hearing, Codman reserved decision. On April 16, 1973, Phipps sent the tenants another letter alleging two further acts of misconduct by Thomas Lopez, Sr., on March 17 and March 23, 1973. The landlord requested a further hearing to explore these charges and to introduce various records that have been subpoenaed from the Police Department. The final hearing was held on May 2, 1973; although they were informed of the date and time of the hearing, the tenants did not attend.

In a report dated July 10, 1973, the hearing officer held that the charges against the tenants furnished substantial ground for the landlord's refusal to renew the Lopez' lease. Although the hearing officer found that the landlord had not presented sufficient evidence to prove a number of the charges, he held that the following charges had been established:

(1) On the night of March 20, 1972, a security guard found Thomas Lopez Sr., lying drunk in the lobby of the Lopez' apartment building. When the guard told him to go upstairs, Lopez swung at him and took out a liquor bottle which smashed on the floor. Police who had been summoned found on Lopez's person a knife 4 to 6 inches long with a hooked point.

(2) On June 23, 1972, the two Lopez boys tampered with the lock of another tenant.

(3) On July 8, 1972, the New York police were called on a complaint that Thomas Lopez, Sr., was "breaking and throwing objects."

(4) On November 14, 1972, Thomas Lopez, Jr., was arrested at the leased premises for a felonious burglary and felonious criminal mischief at 530 Second Avenue, a building near the tenants' apartment.

(5) At 3:25 a. m. on December 19, 1972, Thomas Lopez, Jr., burglarized a bookstore at 310 E. 26 Street, the same building in which Lopez' apartment was located. When ordered by an officer to halt, he sought to escape and pointed a gun at the officer, who shot him. Jose was also found on the premises.

The hearing officer sustained a charge raised at the May 2 hearing that on March 23, 1973, Thomas Lopez, Sr., was arrested for reckless endangerment, possession of a dangerous instrument, and resisting arrest. The arrest record indicated that Lopez, who was drunk, attempted to grab the arresting officer's gun and in the ensuing struggle pulled a knife on the officer.

Shortly after the hearing officer rendered his decision, Phipps served a 30-day notice of termination of tenancy; on September 11, summary eviction proceedings were instituted. These led to a warrant of eviction which the state court stayed until September 30, 1973. Mrs. Lopez countered with this action in the District Court for the Southern District of New York under the Civil

Rights Act, 42 U.S.C. § 1983, and its jurisdictional implementation, 28 U.S.C. § 1343(3), to enjoin execution of the judgment of eviction.

The motion for a preliminary injunction came on for hearing before Judge Griesa, who rendered an oral opinion on October 4, 1973. Recognizing that the hearing officer's decision "shows a careful and objective analysis of the facts," the judge said: "If I was hearing this matter on or about July 10, 1973, I have some serious doubt as to whether I would grant the plaintiff any relief." However, it was now early October, he said, "and there is reason to believe that a re-examination of the facts by Mr. Codman or some other designated hearing officer should be made." The reasons were four: One was that Thomas Lopez, Sr., was "in fact separated from plaintiff Narcisa Lopez"—although no separation decree had been entered and Thomas was legally free to return to the apartment, as he had done in March 1973.[1] Another was that Thomas, Jr., had to be hospitalized for the gunshot wounds he suffered in the attempted burglary of December 19, 1972 and that "he has been withdrawn and may well have been very much removed from mischievous activity since that serious wound." The third was that the younger son, Jose, had gone voluntarily to a state camp in connection with a juvenile delinquency charge following the December 1972 burglary, and that no reports of subsequent misconduct by him or by Thomas, Jr., had been brought to the court's attention. The fourth was that a social worker had been assigned to the household "in an effort to accomplish some reform and rehabilitation." Accordingly, he granted a temporary injunction for a period of forty-five days

during which Phipps was to have "the opportunity to hold another hearing." When Phipps declined to avail itself of that opportunity, the judge extended the injunction to run until the final determination of this action. His reasoning was that "there was a violation of due process by defendant in that the action being taken to evict plaintiff was based in large part upon obsolete facts, and defendant had taken insufficient steps to obtain and consider current information." This appeal followed.

## II.

No one can read the hearings before the district judge and his two opinions without being struck by his sincerity and compassion. However, the issue before him was not whether Phipps had worked out the optimum adjustment in the interests of the Lopez family, the project and the other tenants, but whether in the course of determining not to renew the lease, Phipps had denied the plaintiff due process of law. Mrs. Lopez' entitlement to traditional due process protections turns on whether the eviction by Phipps constituted government action and whether she had a legal interest going beyond the stated term of the lease. Her claim that due process was denied depends primarily upon her showing that their eviction was impermissibly based on "obsolete facts," as the judge held, or that Mr. Codman was not qualified to act as a hearing officer, as she asserts. We rule with her on her claim that, before being evicted for non-renewal of her lease, she was entitled to the due process protections normally required of governmental agencies, but against her on her claim that she was denied the protections that were due.

---

1. The judge stated that "[a]s far as this Court is concerned the leasehold or rental interests of Thomas Lopez expired on the December 31, 1972 date, and as far as this Court is concerned Thomas Lopez has no further interests whatever and no right to occupancy in that apartment or in that building," and that the landlord might take "whatever steps are necessary to prevent

Thomas Lopez from being on the premises." However much this determination may have been in the spirit of Solomon, we are at a loss to understand how the judge could create a new tenancy for Mrs. Lopez alone or endow the landlord with the right to prevent Mr. Lopez from exercising his rights either as a tenant or as a husband.

In McGuane v. Chenango Court, Inc., 431 F.2d 1189 (2 Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1238, 28 L. Ed.2d 532 (1971), we rejected a claim that tenants of a project receiving federal mortgage insurance under § 221(d)(3) of the National Housing Act were entitled to a hearing before being evicted by state court proceedings after the landlord's refusal to renew. Weigand v. Afton View Apartments, 473 F.2d 545 (8 Cir. 1973), rejected a similar claim based on federal funding under § 236 of the Housing Act and a reduction in real estate taxes allowed by Minnesota. However, in McQueen v. Druker, 438 F.2d 781 (1 Cir. 1971), the court found government action in the context of a claimed retaliatory eviction in violation of First Amendment rights. Distinguishing McGuane v. Chenango Court, Inc. as holding "only that mere receipt of mortgage insurance under the National Housing Act does not make a private apartment house owner an agency of a state," a proposition with which it agreed, 438 F.2d at 782 n. 4, the Mc-'Queen court found a much larger governmental involvement in the project there *sub judice*. The defendant in *McQueen* purchased the property from the Boston Redevelopment Authority, which had condemned it in connection with an urban renewal program; the BRA played a continuous role in the operation of the project, through detailed regulation of construction, rental agreements, admissions policies, and many aspects of management.[2] Joy v. Daniels, 479 F.2d 1236 (4 Cir. 1973), similarly distinguishing *McGuane*, 479 F.2d at 1238–1239 & n. 3, found government action with respect to eviction primarily on the basis of the added factor of receipt of rent supplements from the FHA under 12 U.S.C. § 1701s, for which specific authorization from a county council was required. On stronger facts, this court in Male v. Crossroad Associates, 469 F.2d 616, 620–622 (2 Cir. 1972), found state action with respect to tenant selection in an urban renewal project which city officials had originated and in which they were continuously involved and which "was governed by a phalanx of state and federal regulations," *id.* at 618; accord, Smith v. Holiday Inns of America, 336 F.2d 630 (6 Cir. 1964); Colon v. Tomkins Square Neighbors, Inc., 294 F.Supp. 134, 137 (S.D.N.Y.1968); McClellan v. University Heights, Inc., 338 F.Supp. 374, 380–82 (D.R.I.1972).

Surveying the array of decisions, we find this case much closer to the government action end of the spectrum than *McGuane*, indeed closer than Joy v. Daniels. It seems to present only a shade less government involvement than *Male*. We therefore hold that Phipps was subject to the same due process requirements with respect to eviction that apply to a municipal housing authority. We do not here go beyond tenant eviction and selection, which we have already considered in *Male*; we leave open what, if anything, due process requires with respect to rent increases in a project such as this. Compare Hahn v. Gottlieb, 430 F.2d 1243, 1246–1249 (1 Cir. 1970); Langevin v. Chenango Court, Inc., 447 F.2d 296 (2 Cir. 1971).

Relying on Board of Regents v. Roth, 408 U.S. 564, 577–578, 92 S.Ct. 2701, 33

---

2. The housing developments in *McQueen* and *McGuane* were both constructed under the § 221(d)(3) Below Market Interest Rate program, which provided that the developer's interest rates would be limited to 3%, although the project at issue in *McQueen* had substantial state supervision and support in addition to the § 221(d)(3) federal subsidy. As we noted in Wahba v. New York University, 492 F.2d 96, 103 (2 Cir. 1974), there is a puzzlement how the receipt of *federal* aid creates *state* action to which alone 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) apply. The puzzlement is lessened—perhaps eliminated—when the federal assistance is conditioned upon state action or supervision is vested in a state or municipal agency. Compare the well-known decision in Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959, 967–968 (4 Cir. 1963) (en banc), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

L.Ed.2d 548 (1972), Phipps says that under the circumstances of this case, the plaintiff had no right to continued occupancy of the apartment that would have been constitutionally protected even if the project had been that of a municipal authority, since the Lopez tenancy expired by its terms on December 31, 1972 and the lease contains no provision for renewal. We appear to have assumed the contrary in Escalera v. New York City Housing Authority, 425 F.2d 853 (2 Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970), where we required due process hearings although the leases were month-to-month automatically renewable tenancies, terminable by either party at the end of any month upon the giving of one month's notice, 425 F.2d at 857. However, the problem was not discussed and the decision antedated *Roth.*

Plaintiff counters with the statement in *Roth's* companion case, Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), that:

> A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

In Joy v. Daniels, *supra,* 479 F.2d at 1239–1242, Judge Craven, writing for the Fourth Circuit, faced the precise issue here presented. He found the penumbras of the Federal Housing and Development Act and the custom of renewal thereunder sufficient that the case was attracted by Perry v. Sindermann rather than by *Roth.* See also Note, Procedural Due Process in Government —Subsidized Housing, 86 Harv.L.Rev. 880, 890–91, 905 (1973). We agree and have little to add. The federal government, the states and the cities which have extended aid to low and middle income housing hardly expected that a tenant could be evicted at the end of his term simply at the landlord's whim, when substitute housing could be obtained, if at all, only with delay, disruption in living habits and expense. *Cf.* Morrissey v. Brewer, 408 U.S. 471, 479, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).[3] Purely private housing is, of course, a different matter, see Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972).

### III.

Plaintiff contends that even if the foregoing analysis is correct, the temporary injunction must be affirmed, quite apart from the ground on which it was issued, because Mr. Codman was not a disinterested hearing officer.

As indicated, Mr. Codman was the manager of Lambert Houses, another project owned by the parent of Phipps. Like the project here in question, Lambert Houses is operated by Phipps Houses Services, Inc., a management company which hires the managers of the various projects. Plaintiff argues that Codman was necessarily management-oriented and therefore could not be truly impartial.[4]

---

3. It must be recognized, however, that allowing hearings in refusal-to-renew cases poses a problem not present in welfare termination and many other types of cases involving termination of a governmentally bestowed benefit—namely, the unwillingness of fellow tenants to testify for fear of reprisal and the hostility between groups of tenants that may be engendered. See Note, *supra,* 86 Harv. L.Rev. at 906–07. As there suggested, such factors may require some restriction of the right of confrontation, along lines such as those suggested by the Chief Justice in Morrissey v. Brewer, *supra,* at 487. We leave such questions for another day.

4. We reject the contention that Mr. Codman displayed actual bias by having allegedly stated, at the beginning of the hearing, "that he thought the allegations against Mrs. Lopez and her family were sufficient to justify Phipps Houses terminating her tenancy." The charges were obviously sufficient if proved; Codman's statement does not differ essentially from a judge's action in sustaining a complaint against a motion to dismiss for failure to state a claim on which relief can be granted. Our reading of Mr. Codman's decision leads us to agree fully with the district judge that he made "a careful and objective analysis."

■ Plaintiff's argument immediately runs into an obstacle in the very decision, Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), on which her case depends. In discussing the need for "an impartial decision maker" on the issue of welfare termination, the Supreme Court in *Goldberg* sanctioned the use of welfare agency officials as hearing examiners. Mr. Justice Brennan, writing for the Court, stated that even "prior involvement in some aspects of a case will not necessarily bar a welfare official from acting as a decision maker" so long as he has not "participated in making the determination under review." While we said in Escalera v. New York City Housing Authority, *supra*, 425 F.2d at 863, that a tenant facing eviction "should be afforded the opportunity to present his side of the case in the presence of an impartial official, not merely to the project manager who instituted the proposed action against the tenant," the opinion in no way indicated that an official was not "impartial" simply because he was an officer of the Housing Authority.[5] We are not aware that any of the cases involving the dismissal or suspension of students from public universities have considered it to be a denial of due process that decisions rested, in whole or in dominant part, in faculty members or in the college president, although such persons presumably would be more inclined than outsiders to give high priority to maintaining order on the campus. See, e. g., Wasson v. Trowbridge, 382 F.2d 807, 813 (2 Cir. 1967); Powe v. Miles, 407 F.2d 73, 85 (2 Cir. 1968); Winnick v. Manning, 460 F.2d 545, 548–549 (2 Cir. 1972); Blanton v. State University

of New York, 485 F.2d 377, 386 (2 Cir. 1973). As the hearing requirement is imposed on more and more agencies, private as well as public, there will be greater and greater necessity for entrusting decision to agency personnel. While professional hearing officers might be preferable, see Note, *supra*, 86 Harv.L.Rev. at 909–10, there may not be enough of them to go around. See Schwartz & Wade, Legal Control of Government: Administrative Law in Britain and the United States, 121–24 (1972). Moreover, confiding the decision on the propriety of refusal to renew to a person with experience in the management of housing projects has positive factors as well as the negative ones that plaintiff emphasizes. Be all that as it may, "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation," Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). The fact that Mr. Codman might have been disqualified as a judge or subject to challenge for cause as a juror in a dispute between Phipps and Mrs. Lopez does not, either in principle or under the authorities, infect the hearing with a lack of due process.

## IV.

■ We turn therefore to the ground on which the judge based his decision, namely, that "the action being taken to evict plaintiff was based in large part upon obsolete facts." It is well to repeat at the outset that the Civil Rights Act does not empower a federal judge to interfere with a "state" landlord's deci-

5. The procedures now required by the HUD circular governing evictions from public housing projects, Grievance Procedure in Low Rent Public Housing Projects, HUD Circular RHM 7465.9 (Feb. 22, 1971), are inapplicable here. Nonetheless, the procedure followed in this case would seem to comply with the requirements of the circular. The circular provides that a public housing authority can select either "an impartial official or a hearing panel" to hear tenant grievances. If the panel is used, the

tenants and the housing authority are to be equally represented, "with an impartial member appointed as a tie breaker." No specific restrictions are placed on the "impartial official" if the authority opts to use a single hearing officer. Thus Codman apparently would not be disqualified from serving as the impartial hearing officer under the provisions of the circular simply because he was an employee of another Phipps project.

sion not to renew a lease simply because he thinks the decision harsh or unwise; he is authorized to do this only if the tenant has been deprived of due process of law.

The question for decision by the hearing officer was whether Phipps was entitled to serve the notice of termination when it did. This depended primarily on the conduct of the Lopez family prior to January 12, 1973, although it was appropriate for the hearing officer also to consider subsequent conduct, whether good or bad, up to the time when the record was closed on May 2. Nothing in the papers before us indicates that the considerations urged before Judge Griesa were presented to the hearing officer either at the hearings of March 6 or May 2, by a request to reopen the record in the interval between the hearing of May 2 and the decision of July 10, or even after service of the notice of termination on July 16. Moreover, the judge in effect agreed that if these considerations had been presented as late as July, the hearing officer could properly have rejected them. What the judge did was the equivalent of granting a belated petition for rehearing, addressed not to the hearing officer but to the federal court.

■■ The concept of due process inevitably entails some delay between the conduct claimed by the landlord to warrant termination of a tenancy and the decision whether termination is justified. But due process cannot demand that the running of time required to give a fair hearing and prepare a reasoned decision should also entail the right to a rehearing on the basis of subsequent developments not presented to the hearing officer. The classic statement is Mr. Justice Jackson's in ICC v. City of Jersey City, 322 U.S. 503, 514–515, 64 S.Ct. 1129, 1135, 88 L.Ed. 1420 (1944):

> If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the discretion to be invoked was that of the body making the order, and not that of a reviewing body.

He went on to note that "[o]nly once in the history of administrative law has this Court reversed a Commission for refusing to grant a rehearing on the contention that the record was 'stale'", citing Atchison, Topeka & Santa Fe Ry. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932).[6] He added, however, that the Court "promptly restricted that decision to its special facts, United States v. Northern Pacific Ry. Co., 288 U.S. 490, 53 S.Ct. 406, 77 L. Ed. 914, and it stands virtually alone." It still does. See 1 Davis, Administrative Law Treatise § 8.18 at 603 (1958). To be sure, refusal to renew a lease in a low and medium income housing project tugs at the heart strings considerably more than the usual agency determination. On the other hand, to impose the Atchison principle on non-renewal hearings, with the added feature that a federal judge may order such a rehearing even when none was requested of the hearing officer, would mean that no tenant could ever be evicted, even for egre

6. In the Atchison case the record in the railroad rate-making proceeding had closed in September 1928. The Great Depression struck before the decision in July 1930, but the ICC denied two petitions for rehearing filed in September 1930 and February 1931, before the order reducing rates had become effective. The Court held that because of the unique change in economic conditions between September 1928 and February 1931, it was an abuse of discretion for the Commission to refuse to reopen the record. It is not clear, however, that even the Atchison case was decided on constitutional grounds.

giously bad conduct, if he behaved properly while under the threat, and that federal courts would be asked to substitute their judgment for that of hearing officers in thousands of cases a year. If, as urged by counsel for appellee, the Lopez boys have reformed and Mr. Lopez can be kept away, this is all to the good. Under these circumstances, the judge could properly have urged Phipps to reconsider its decision. But if Phipps was entitled to serve its notice of termination, as the hearing officer permissibly found it was, due process does not require a further hearing because of improved conduct during the period consumed by the hearing which the tenant demanded or the federal court proceedings which she initiated.

■ Appellee makes two other points, but these require only brief comment. Relying on Tyson v. New York City Housing Authority, 369 F.Supp. 513 (S. D.N.Y.1974), she contends that the hearing officer's reliance on the conduct of her now allegedly separated husband was impermissible. *Tyson*, however, is readily distinguishable, since there the Housing Authority sought to evict tenants solely because of the criminal act of an adult son who did not live with them at the time the act was committed. Here the husband is a named tenant and was living in the household at the time of most of the charged misconduct. Moreover, there is still no legally effective method for keeping him away, however much this may be desired. Beyond all this the hearing officer reasonably found that both the conduct of Thomas, Jr., described in item (4) and of Thomas, Jr., and Jose described in item (5) were a sufficient basis for refusal to renew.

■ The other point is that Phipps had never established standards to which tenants knew they must conform as a condition to renewal. But paragraph 9 of the lease, which we have quoted above, informed a tenant that he would be subject not simply to non-renewal but to eviction for conduct of the sort in which Mr. Lopez and his sons had engaged. Moreover, no enunciation of standards is needed to apprise even a family not fluent in English that burglarizing a bookstore on the premises and threatening to shoot an arresting officer would constitute grounds for refusal to renew a lease.[7]

The order granting a temporary injunction is reversed.[8]  No costs.

7. While such termination need not be based on detailed, previously promulgated regulations, due process requires that the termination not be arbitrary or capricious, see Fuller v. Urstadt, 28 N.Y.2d 315 321 N.Y.S.2d 601 (1971) ; Vinson v. Greenburgh Housing Authority, 29 App.Div.2d 338, 288 N.Y.S.2d 159 (2d Dep't 1968), aff'd without opinion, 27 N.Y.2d 675, 314 N.Y.S.2d 1 (1970).

8. If counsel for Phipps had asked us also to direct dismissal of the complaint, we might well have done so, as we could do even in the absence of such a request.  See Metropolitan Water Co. v. Kaw Valley Drainage Dist., 223 U.S. 519, 523, 32 S.Ct. 246, 56 L.

Ed. 533 (1912) ;  Guardian Trust Co. v. Kansas City So. Ry. Co., 171 F. 43, 51 (8 Cir. 1909) ;  Triumph Hosiery Mills, Inc. v. Triumph International Corp., 308 F.2d 196, 200 (2 Cir. 1962) ;  Electronic Specialty Co. v. International Controls Corp., 409 F.2d 936, 952 (2 Cir. 1969).  However, in light of counsel's inadequate and intemperate brief, which dealt almost exclusively with the question whether plaintiff had a sufficient property interest to sustain a complaint and ignored the issues discussed in parts III and IV of this opinion, we shall not do so.  In contrast, we compliment counsel for Mrs. Lopez on her excellent and helpful brief, although we sustain her only in part.