In the Matter of Bennie Vinson et al., Respondents, *v.* Greenburgh Housing Authority, Appellant.

Second Department, March 11, 1968.

*Bleakley, Platt, Schmidt, Hart & Fritz (John C. Marbach* of counsel), for appellant.

*Levine & Frost* and *Rudolph D. Raiford (Robert P. Levine* of counsel), for respondents.

Hopkins, J. The petitioners in this proceeding under article 78 of the CPLR are husband and wife and the tenants in a housing project owned and managed by the appellant, the Greenburgh Housing Authority (hereafter called "Authority"). The Authority exists as a public corporation through act of the Legislature (Public Housing Law, § 3, subd. 2; § 457). The petitioners have occupied an apartment under a written lease since July 16, 1962.

The lease provides for a term of one month, to be automatically renewed for successive terms of one month, unless terminated by either party upon giving one month's prior notice in writing. The rental is stipulated at $66 a month, which may be increased in the event that the petitioners' family income shall have increased beyond a certain ratio to that rental.

On March 29, 1966 a written notice of termination of the lease was given by the Authority to the petitioners, effective April 30, 1966. The notice states no reason for the termination. The petitioners did not comply with the notice and on May 3, 1966 the Authority commenced summary proceedings to evict the petitioners in the Justice's Court of the Town of Greenburgh. This proceeding to annul the determination of the Authority to evict the petitioners and to stay the summary proceedings followed on May 12, 1966.

The petitioners allege that the regulations of the Authority establish a standard of eligibility and conduct for continued occupancy by its tenants, that is, so long as the tenants do not constitute a detriment to the health, safety and morals of their neighbors or to the community, or an adverse influence on sound family and community life, or a source of danger to the premises or the peaceful occupation of other tenants. Further, they allege that, upon receipt of the notice of termination of their lease, the petitioner wife was told by the attorney for the Authority that she and the children of the family would be permitted to remain as tenants, provided that she compel her husband to leave the apartment and that she seek public welfare assistance and an order of support by her husband in the Family Court; and that she refused to comply with this instruction. In further support of their proceeding, the petitioners submitted an affidavit by their attorney who stated therein that the attorney for the Authority had refused to discuss the matter with him or to give any reason for the eviction, other than the termination of the lease itself.

The Authority's return alleges no reason for the termination of the lease; it admits that the petitioners' attorney spoke to its attorney, who informed the former that the Authority was not required to give a reason for the eviction. The Authority claims as a defense that the notice validly terminated the lease and that its determination was neither a judicial nor a quasi-judicial act and hence not reviewable by the court.

Special Term in effect granted the relief sought by the petitioners, unless the Authority submit an appropriate return stating the grounds for its determination. Special Term reasoned that the petitioners had asserted grave charges of

irresponsibility by the Authority and that the latter's contention that its exercise of discretion to terminate the lease was absolute could not be sustained. By permission of Special Term, the Authority appeals (CPLR 5701, subd. [c]).

The Authority argues that the provisions in the lease for its termination are plain and binding on both parties and cannot be modified by the court. To interfere with its determination by requiring an explanation, the Authority urges, imposes a burden not demanded from other landlords and thus discriminates unfairly and invalidly against it. On the other hand, the petitioners press on us the contention that the Authority may not act arbitrarily toward its tenants, for otherwise a tenant might be evicted without cause or justification.

We meet, then, the question of the nature of the relationship between a housing authority and its tenants. Ordinarily, provisions in a lease permitting its termination upon the service of a notice of a stated period are enforcible by the landlord at will (*Zule* v. *Zule*, 24 Wend. 76; cf. *Metropolitan Life Ins. Co.* v. *Carroll*, 43 Misc 2d 639). The relationship between landlord and tenant is considered contractual simply; and the terms of the lease for termination, unless calling for a reasonable basis for action, may be exercised without explanation. But a housing authority is not an ordinary landlord, nor its lessees ordinary tenants.

Our Constitution recognizes low-rent housing as a proper governmental function (N. Y. Const., art. XVIII). The Legislature, in response to its direction, has enacted the Public Housing Law. The statute empowers the construction of housing through the agency of authorities (Public Housing Law, § 30), which may appoint a general manager (§ 32), make by-laws and regulations (§ 37, subd. 1, par. [w]), and conduct hearings (§ 37, subd. 1, par [x]). The authorities are empowered to select tenants qualified as persons of low income (§ 156), under leases which provide for rents adjustable according to income (§ 37, subd. 1, par. [k]).

Thus, our State has distinguished low-rent housing as a human need to be satisfied through governmental action and has created by specific statutory provisions the structure of the relationship between the housing authority and the tenant. The statute consequently enters into and becomes a part of the lease; and its spirit and intent must be the guiding beacon in the interpretation of the terms of the lease.

" ' Due process of law,' is not confined to judicial proceedings, but extends to every case which may deprive a citizen of life,

liberty, or property, whether the proceeding be judicial, administrative, or executive in its nature " (*Stuart* v. *Palmer,* 74 N. Y. 183, 190–191). Once the State embarks into the area of housing as a function of government, necessarily that function, like other governmental functions, is subject to the constitutional commands. Low-rent housing is not the leasing of government-owned property originally acquired for a different purpose, but now surplus or not required for that purpose, on a sporadic or temporary basis (cf. *United States* v. *Blumenthal,* 315 F. 2d 351), where the traditional notions of private property might well be applied; rather, it imports a status of a continuous character, based on the need of the tenants for decent housing at a cost proportionate to their income, subject to the compliance by the tenants with reasonable regulations and the payment of rent when due. " The government as landlord is still the government. It must not act arbitrarily, for, unlike private landlords, it is subject to the requirements of due process of law " (*Rudder* v. *United States,* 226 F. 2d 51, 53).

What may be complete freedom of action under private contractual arrangements falls to restricted action under public housing leases (cf. *Housing Auth. of City of Los Angeles* v. *Cordova,* 130 Cal. App. 2d 883, cert. den. 350 U. S. 969; *Kutcher* v. *Housing Auth. of City of Newark,* 20 N. J. 181; *Chicago Housing Auth.* v. *Blackman,* 4 Ill. 2d 319; *Lawson* v. *Housing Auth. of City of Milwaukee,* 270 Wis. 269; *Edwards* v. *Habib,* 227 A. 2d 388 [D. C., Ct. of App.]). We think that a housing authority cannot arbitrarily deprive a tenant of his right to continue occupancy through the exercise of contractual provision to terminate the lease. In other words, the action of the housing authority must not rest on mere whim or caprice or an arbitrary reason.

Several considerations combine to justify the difference in treatment between governmental agencies and private individuals. Realistically, it must be acknowledged that the housing authority prescribes the terms of the lease and that the tenant does not negotiate with the authority in the usual sense (see Reich, The New Property, 73 Yale L. J. 733, 749–752; Friedman, Public Housing and the Poor: An overview, 54 Cal. L. Rev. 642, 660; note, Government Housing Assistance to the Poor, 76 Yale L. J. 508, 512). In this condition of affairs, to impose a requirement of good faith and reasonableness on the party in the stronger bargaining position when he exerts a contractual option is but a reflection of simple justice (cf. *New York Cent.*

*Iron Works Co.* v. *United States Radiator Co.,* 174 N. Y. 331; *Wood* v. *Duff-Gordon,* 222 N. Y. 88).

That requirement, even before the advent of housing as a public function, was read into municipal agreements dealing with the use of governmental facilities (*Gushee* v. *City of New York,* 42 App. Div. 37, 48; cf. *Lincoln Safe Deposit Co.* v. *City of New York,* 210 N. Y. 34, 40). In *Gushee* (*supra* pp. 48–49), thus, it was said: "But if at any time in the future it shall determine in good faith to take away the restaurant, the plaintiff must submit, because he takes his agreement subject to the power which the law has given to make these regulations. Until, however, some such regulation is made the plaintiff has the right to his contract and to the protection of the court to prevent any capricious or unnecessary interference with it."

Moreover, in balancing the interests of the State against the interests of the individual, the advantages to the State are outweighed by the detriment to the individual, if we were to deny the tenant protection from an arbitrary termination of the lease. The eviction of a family in the income bracket eligible under the standards of public housing from its household is a serious blow. If, in fact, a mistake has been made in the accusation against the tenant of improper conduct or a violation of regulations, or if the reason for the ouster has no better basis than dislike or unjustified discipline, the requirement of the disclosure of the ground for the termination of the lease affords the tenant the opportunity to protest its exercise. On the other hand, the Authority will suffer no more than delay in the ultimate eviction in the event the termination of the lease is made on reasonable grounds; and in the meantime the Authority may control excessive misbehavior of the tenant through police action.

The declared purpose of the statute makes clear that low-rent housing was considered to be permanent and not transitory and that, so long as the tenants remain qualified and do not violate the reasonable regulations of the State agency, they would not be evicted for grounds extrinsic to these requirements. So, the State policy was established in contemplation of " insanitary and substandard housing conditions owing to overcrowding and concentration of the population," as a result of which " the construction of new housing facilities, under public supervision in accord with proper standards of sanitation and safety and at a cost which will permit monthly rentals which persons of low income can afford to pay " is necessary; and it was acknowledged that " these conditions

require the creation of the agencies and instrumentalities hereinafter prescribed, which are declared to be agencies and instrumentalities of the state for the purpose of attaining the ends herein recited '' (Public Housing Law, § 2).

To be sure, some State courts have held that a housing agency may terminate a lease with a tenant with similar provisions in the same manner as a private landlord (*Housing Auth. of City of Durham* v. *Thorpe,* 267 N. C. 431, vacated and remanded 386 U. S. 670; *Pittsburgh Housing Auth.* v. *Turner,* 201 Pa. Super Ct. 62; *Columbus Metropolitan Housing Auth.* v. *Simpson,* 85 Ohio App. 73; *Chicago Housing Auth.* v. *Ivory,* 341 Ill. App. 282). We think that the better rule is that the housing agency must have a reasonable ground for termination.

In *Thorpe* (*supra*), the petitioner was a tenant in a Federally-assisted public housing project in North Carolina. The lease was terminable by either party upon 15 days' notice. The petitioner was elected president of a tenants' organization about a year after the beginning of occupancy. The housing authority on the day following the election gave notice of termination. It refused to give any reason to the petitioner for the termination. Thereafter it brought eviction proceedings against her. In the proceedings it was stipulated that the authority had not terminated the tenancy because of the petitioner's election as president of the tenants' organization, but the stipulation did not state the reason for the termination. The Supreme Court of North Carolina affirmed a judgment in favor of the authority, saying that it was immaterial what may have been the reason for the authority's disinclination to continue the petitioner's occupancy.

The Supreme Court of the United States vacated the judgment and remanded the proceedings to the courts of North Carolina. The majority of the court found that a directive issued by the Federal Department of Housing and Urban Development subsequent to the notice of termination had stated that it was essential that no such notice should be given unless the tenant be told the reason for his eviction; and held that the procedure prescribed by the directive governed the disposition of the appeal. It is implied by the decision that the petitioner should be accorded on the remand the treatment provided by the directive. In a concurring opinion, Mr. Justice DOUGLAS held that the North Carolina courts should determine the reason for the petitioner's eviction. Thus, he said (386 U. S. 670, 678): '' Over and over again we have stressed that ' the nature and the theory of our institutions of government, the principles upon which they are supposed to rest * * * do not mean to leave room

for the play and action of purely personal and arbitrary power ' (*Yick Wo* v. *Hopkins,* 118 U. S. 356, 369–370) and that the essence of due process is ' the protection of the individual against arbitrary action.' *Ohio Bell Telephone Co.* v. *Public Utilities Comm'n,* 301 U. S. 292, 302; *Slochower* v. *Board of Education,* 350 U. S. 551, 559. Any suggestion to the contrary ' resembles the philosophy of feudal tenure.' Reich, The New Property, 73 Yale L. J. 733, 769. It is not dispositive to maintain that a private landlord might terminate a lease at his pleasure. For this is government we are dealing with, and the actions of government are circumscribed by the Bill of Rights and the Fourteenth Amendment. ' The government as landlord is still the government. It must not act arbitrarily, for, unlike private landlords, it is subject to the requirements of due process of law. Arbitrary action is not due process.' *Rudder* v. *United States,* 96 U. S. App. D. C. 329, 331, 226 F. 2d 51, 53.''

Again, he said (pp. 679–681) :

'' This does not mean that a public housing authority is powerless to evict a tenant. A tenant may be evicted if it is shown that he is destroying the fixtures, defacing the walls, disturbing other tenants by boisterous conduct and for a number of other reasons which impair the successful operation of the housing project. Eviction for such reasons will completely protect the viability of the housing project without making the tenant a serf who has a home at the pleasure of the manager of the project or the housing authority.

'' Here, the Superior Court found that petitioner had not been evicted because she had engaged in efforts to organize the tenants of the housing project or because she had been elected president of the Parents' Club. On appeal to the North Carolina Supreme Court, petitioner contended that the finding was erroneous. The State Supreme Court did not pass on the finding of the Superior Court since it concluded that the Housing Authority could terminate the lease and evict petitioner for any reason. As I have said, it is argued that the circular of the Department of Housing and Urban Development answers petitioner's claim that she was entitled to an administrative hearing before her lease was terminated. But petitioner has already had a hearing in the state courts. And the status of the circular, whether a regulation or only a press release, is uncertain, an uncertainty which the Court does not remove. Vacating and remanding ' for such further proceedings as may be appropriate in light of the * * * circular ' therefore furnishes no guidelines for the state courts on remand, and does not dispose of the basic issue presented. I would vacate

and remand to the state courts to determine the precise reason why petitioner was evicted and whether that reason was within the permissible range for state action against the individual."

The Authority here notes that it is not subject to Federal supervision, as no Federal funds were received as assistance in the project, and argues that the suggested procedure is therefore not applicable to it. Strictly speaking, this is so, but we do not believe that it makes a material difference in the result. The rights of the petitioners should be safeguarded to prevent the use of arbitrary power.

Doubtless, there exist areas of such sensitivity in the relations between State and individual that rules of finality will be enforced, even as against the charge of arbitrariness—i.e., eminent domain, taxation and tariffs. But, even in such cases, the circumstances dictate the effect to be given to the constitutional rights. " It [the court] has weighed the relative values of constitutional rights, the essentials of powers conferred, and the need of protecting both " (*St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 81 [concurring opinion of Mr. Justice BRANDEIS]). The unrestricted exercise of power by administrative officials has increasingly been made the subject of judicial scrutiny (cf. *Sleepy Hollow Val. Committee* v. *McMorran,* 20 N Y 2d 190; *Matter of Brown* v. *McMorran,* 23 A D 2d 661).

Once the field of housing as a utility has been encompassed by the State, we think that the traditional protection against the caprice of State agencies must be preserved. " Discretionary administrative power over individual rights  *  *  * is undesirable *per se,* and should be avoided as far as may be, for discretion is unstandardized power and to lodge in an official such power over person or property is hardly conformable to the ' Rule of Law ' " (Freund, Historical Survey in Growth of American Administrative Law, pp. 22–23).

The order below should be affirmed, with $10 costs and disbursements.

BELDOCK, P. J. (dissenting). The basic issue raised by this proceeding is whether a public corporation, such as the appellant Greenburgh Housing Authority, may assert the same right as a private corporation or individual to terminate a month-to-month tenancy, pursuant to the provisions of the operative lease, without giving a reason for its action.

The majority of this court concedes that if the appellant were a private landlord there would be no question that the lease between the parties could be terminated, without reason, by virtue of its provisions allowing termination by the giving

of the required notice by either party. Although I am in sympathy with the plight of the petitioners if they are to be evicted from their apartment, nevertheless, I am of the opinion that, in the absence of a clear expression of legislative intent to the contrary, the Authority is under no obligation to give a reason in support of its determination to terminate the tenancy. It was said in *Brand* v. *Chicago Housing Auth.* (120 F. 2d 786, 789): "We do not doubt, as pointed out by plaintiffs, but that their eviction will result in hardships. This is a result which inevitably follows upon the termination of any lease which, by its terms, has been advantageous to the lessee. Such a consequence, however, regrettable as it is, can not determine the rights of the parties as fixed by law and the terms of the lease."

In my opinion, the public nature of the Authority's activities and purposes does not affect its right to rely on the express provisions of the lease. There is no obligation either under the terms of the lease or by statutory or constitutional law which compels the Authority to give reasons for the termination of the lease. The petitioners' position rests largely on the underlying premise, although not specifically urged, that by reason of their acceptance as tenants they acquired a vested property right which could not be destroyed by what is claimed to have been the unreasonable and arbitrary act of the Authority in terminating the lease without giving the reasons therefor. However, the petitioners have no inherent right to the continuation of their tenancy in the public housing project. Any property rights acquired by them were circumscribed by the terms and conditions of the lease upon which they were founded. "It is our opinion that this provision with reference to the termination of the tenancy is valid and binding upon plaintiffs in the same manner as though the lessor had been a private person rather than a Governmental Agency" (*Brand* v. *Chicago Housing Auth.*, 120 F. 2d 786, 788, *supra; Lynch* v. *United States,* 292 U. S. 571).

I do not believe that the Legislature, in enacting the Public Housing Law, intended that a housing authority be required to give notice of the reasons for the termination of a lease whenever it exercises its right to terminate a month-to-month tenancy pursuant to the provisions of a written lease. On the contrary, if a housing authority were compelled to submit to interrogation and investigation of its reasons for desiring possession of its property at the expiration of each tenant's lease, it would place an unreasonable restraint on its powers and make it more difficult for it to carry out the policies declared

by the Legislature (*Pittsburgh Housing Auth.* v. *Turner*, 201 Pa. Super. Ct. 62).

In *Thorpe* v. *Housing Auth.* (386 U. S. 670), the Supreme Court of the United States failed to reach the constitutional issues now raised by the petitioners. The Supreme Court vacated the judgment of the State court on the ground that after certiorari had been granted the United States Department of Housing and Urban Development issued a circular to local housing authorities which required Federally-assisted housing authorities (not herein involved) to disclose the reasons for the termination of leases of their tenants; and held that the procedures described in the circular should be followed in that case. With respect to the petitioner's contention that she was constitutionally entitled to notice setting forth the reasons for the termination of her lease, and a hearing thereon, the court stated (pp. 671–672): ''We find it unnecessary to reach the large issues stirred by these claims, because of a significant development that has occurred since we granted the writ of certiorari.''

In the absence of any controlling judicial authority to the contrary, I am of the opinion that the petitioners have not been denied due process or deprived of any constitutional right by reason of the actions of the Authority herein. Accordingly, I would reverse the order under review, dismiss the proceeding on the merits, and confirm the determination of the Greenburgh Housing Authority.

BRENNAN and MUNDER, JJ., concur with HOPKINS, J.; BELDOCK, P. J., dissents in an opinion in which CHRIST, J., concurs.

Order affirmed, with $10 costs and disbursements.