**Simone YOUNG, Nathaniel Haynes, Antonio Perez, Anibal Torres, and Victor Hawkins, Plaintiffs,**

v.

**HALLE HOUSING ASSOCIATES, L.P., Ed Tenhor, David Ransom, Richard Roberts, as commissioner of the New York City Department of Housing Preservation and Development, the New York City Department of Hous-**

---

ing Preservation and Development, Martin Oesterreich, as Commissioner of the New York City Department of Homeless Services, and the New York City Department of Homeless Services, Defendants.

No. 00 Civ. 0567(GEL).

United States District Court,
S.D. New York.

May 7, 2001.

Jennifer L. Levy, and Ragini Shah, South Brooklyn Legal Services, Brooklyn, NY, for Plaintiffs Simone Young, Nathaniel Haynes, Antonio Perez, Anibal Torres, and Victor Hawkins, Edward Josephson, South Brooklyn Legal Services, Brooklyn, NY, of counsel.

Robert Callagy, Satterlee Stephens Burke & Burke, New York City, for Defendants Halle Housing Associates, L.P., David Ransom and Ed Tenhor.

Debra A. Hochman, Assistant Corporation Counsel, New York City, for Defendants Richard Roberts, the New York City Department of Housing Preservation and Development, Martin Oesterreich, and the New York City Department of Homeless Services.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs Simone Young, Nathaniel Haynes, Antonio Perez, Anibal Torres and Victor Hawkins are residents of a privately owned and operated supportive-housing single room occupancy facility located at 510 Atlantic Avenue, Brooklyn New York (the "Muhlenberg"). Plaintiffs were tenants at the Muhlenberg prior to its transformation into supportive housing.[1] They bring this action under 42 § U.S.C. 1983 alleging that the Muhlenberg's prohibition of overnight guests violates the First and Fourteenth Amendments to the United States Constitution and several federal statutes and regulations.[2] The Complaint

---

1. The term "supportive housing" used throughout this opinion, although not defined by the parties, refers to housing developed under New York's Supportive Housing Program ("SHP"). The SHP makes loans to not-for profit organizations for the purposes of developing permanent housing for homeless and low-income single adults on the condition that necessary social services are provided on site to qualifying tenants of the residence.

2. The first three causes of action also purport to assert claims under § 1983 for alleged violations of the plaintiffs' rights under the New York State Constitution. However, § 1983 only protects transgressions of federal rights. *See, e.g., California v. LaRue,* 409 U.S. 109, 110 n. 1, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972). Thus, plaintiffs' § 1983 claims predicated upon violations of the New York State Constitution are not properly before the court and will be dismissed.

also alleges violations of the common law and real property law of New York State.

This action has been brought against defendant Halle Housing Associates, L.P. ("Halle Housing"), an entity related to a private non-profit corporation named Lutheran Social Services ("LSS") that owns and manages the Muhlenberg, and two of the Muhlenberg's managers, Ed Tenhor and David Ransom (collectively the "Halle Defendants"). In addition, plaintiffs have sued the New York City Department of Housing Preservation and Development ("HPD"), Richard T. Roberts, as Commissioner of HPD, the New York City Department of Homeless Services ("DHS"), and Martin Oesterreich as Commissioner of DHS, (collectively, the "Municipal Defendants").

At the close of discovery, all of the parties moved for summary judgment. The parties having appeared for oral argument and after careful consideration of all of the submissions, plaintiffs' motion is denied and defendants' motions are granted. The principal issue in the case is whether the actions of the Halle Defendants constitute state action for purposes of § 1983.

### Facts [3]

Most of the relevant facts are not in dispute.

Plaintiffs are residents in a privately owned and operated residence located at 510 Atlantic Avenue in Brooklyn. The residence was formerly a private single room occupancy ("SRO") residence known as the Nevins Hotel (the "Nevins") that had been in a state of disrepair for many years prior to its purchase and rehabilitation by Halle Housing. (*See* Tenhor Dep. at 31–32.) Its tenants apparently included individuals with substance abuse problems, elderly people, and persons suffering from various mental illnesses, none of whom were receiving basic care or social services. (*See* Torres Dep. at 29–30, 32–33; Tenhor Dep. at 75.) Defendant Halle Housing is a not-for-profit limited partnership created for the purpose of acquiring and rehabilitating the Nevins as a supportive housing facility. The general partner of Halle Housing is an entity known as the New Times Operating Corp., whose sole shareholder is an investment fund sponsored by LSS known as the Muhlenberg Community Housing Development Fund Corporation.

In 1995, Halle Housing acquired the Nevins, rehabilitated the facility, and renamed it the Muhlenberg Plaza Residence. Each of the plaintiffs remained a resident after the conversion of the Nevins into the Muhlenberg. The Muhlenberg contains 201 units, 34 of which are studio apartments, containing bathroom and kitchenette facilities and ranging in area from 159 to 242 square feet. The remainder are SRO units ranging in size from 100 to 129 square feet, large enough only for a bed, dresser and chair. Generally, four SRO units share a unisex bathroom. Of the five plaintiffs in this case, only Nathanial Haynes rents a studio apartment. The remaining plaintiffs rent SRO units of various sizes.

The Muhlenberg receives significant amounts of funding from both federal and state governmental sources. In 1995, Halle Housing secured a loan in the amount of $11,380,000 for the purchase and rehabilitation of the Nevins of under the Supportive Housing Program (the "SHP") administered by the New York City Department of Housing Preservation

---

**3.** The following facts, unless otherwise indicated, are drawn from the parties' statements submitted pursuant to Local Rule 56.1.

and Development. The SHP is designed to provide loans to not-for-profit organizations for the purposes of developing permanent housing for homeless and low-income single adults pursuant to Article XI of the New York Private Housing Finance Law. Funds used for the making of Article XI loans are obtained from a variety of federal and local sources. Local funds are available through City capital funds. One of the sources of federal funding is the federal HOME Investment Partnerships Program, 42 U.S.C. § 12741, et seq. Halle Housing subsequently purchased the Nevins using these SHP funds as well as $16,000,000 from private funding sources. Between 1995 and 1996, Halle Housing also received from the City three construction loans totaling $11,224,980. Each of these loans was secured by a mortgage and security agreement. (*See* O'Hanlon Aff. ¶¶ 13, 16.)

Under the terms of the SHP loan, Halle Housing is required to make 60% of all vacancies available to homeless individuals. Because it received HOME funds through the SHP loan, it is also required to make another 40% of its units available to low-income individuals. In addition, upon completion of the rehabilitation, all units became subject to New York's rent stabilization law. These requirements reflected the conditions required by both federal and state law.

Halle Housing also receives rental subsidies under Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f. Under this program, an owner agrees to rehabilitate SRO units for occupancy by homeless individuals, in accordance with the United States Department of Housing and Urban Development's ("HUD") requirements for the program. The federal government subsidizes a portion of a qualifying tenant's rental payments for a unit; in return, the landlord agrees to accept a specified rent applying to the Section 8 units. In addition, HUD imposes certain requirements upon landlords, such as procedures governing the termination of leases. The subsidy attaches to the unit, not to the specific tenant, such that if a tenant leaves the subsidized unit, another person eligible for the program must be placed in the unit. The Section 8 program is administered by the New York HPD under the supervision of HUD. One hundred of the 201 units in the Muhlenberg are governed by Section 8 leases; only one plaintiff, Anibal Torres, lives in a Section 8 unit.

In addition, the Muhlenberg receives contract support subsidies in the amount of $1,085,400 under a three-year agreement with the New York City Department of Homeless Services, pursuant to which the Muhlenberg agrees to provide certain services enumerated by contract, including case management, crisis intervention and desk coverage services. These services are to be administered and supervised by qualified employees of the Muhlenberg, and the funds may not be used to cover the building's general operating expenses. The agreement was renewed for another three years in 1998.

The principal dispute in this case involves the Muhlenberg's overnight guest policy. The Muhlenberg prohibits residents from entertaining visitors between the hours of midnight and eight a.m. The policy is apparently publicized through house rules posted in the lobby of the building. There is some dispute over whether the policy was merely carried over from rules already in place in the Nevins, or whether it was first promulgated after the building became the Muhlenberg. Defendants have provided testimony that the guest policy existed prior to the renovation (*see* Tenhor Dep. at 127–28), but plaintiffs contest the accuracy of the testimony. The rules at issue were

also contained in a Policy and Procedure Manual developed by Ed Tenhor. (*See* Tenhor Dep. at 65–66.) The Muhlenberg staff enforces this policy whether or not the tenant in question rented his premises under the Section 8 program or agreed to the policy in writing. (*See* Tenhor Dep. at 97.)

The policy operates to bar from the premises visitors who have violated the policy in the past, and apparently also those who have had altercations with the management. Testimony by each of the plaintiffs indicates that the policy interfered with their ability to entertain guests freely. Nathanial Haynes was prohibited from celebrating the birth of his nephew with his brother, who was forced to wait outside when he arrived at six a.m. (*See* Haynes Dep. at 36–8.) A female guest of Victor Hawkins was prohibited from staying after midnight on one occasion. (*See* Hawkins Dep. at 49.) The brother-in-law of Antonio Perez was barred from visiting the premises after refusing to leave at midnight. (*See* Perez Aff. ¶ 12.) Simone Young's thirteen-year old daughter was barred from the premises because she had stayed overnight in violation of the guest policy. (*See* Young Dep. at 60.) A friend of Anibal Torres was similarly barred for having an altercation with the Muhlenberg management over their rejection of his rental application. (*See* Torres Aff. ¶ 15, Ransom Dep. at 90.)

The record indicates that the Municipal Defendants played no direct role in the promulgation or enforcement of the over-

night guest policy. The overnight guest rules were written by Ed Tenhor and enforced by the Muhlenberg security staff.[4] Although the rules contain the phrase "as approved by the City of New York" (*see* Hochman Aff. Ex. E.), there is no evidence that the Municipal Defendants were aware of, or approved, the house rules. None of the § 8 leases in the possession of HPD contain any mention of the rules. (*See* O'Hanlon Aff. ¶ 56.) DHS never reviewed the Policy and Procedure Manual drafted by Ed Tenhor that contained a copy of the rule. (*See* Mittelman Aff. ¶¶ 11, 17.) Moreover, both Timothy O'Hanlon, HPD's director of the Supportive Housing Program, and David Mittelman, DHS' director of SRO Housing and Placement, have testified that they were not aware of the rules. (*See* O'Hanlon Aff. ¶ 65; Mittelman Aff. ¶ 17.) Plaintiffs have provided no evidence casting doubt on this testimony.

### The Complaint

The First Amended Complaint (the "Complaint") states nine separate causes of action against both the Halle Defendants and the Municipal Defendants. Claims one through four are brought under 42 U.S.C. § 1983, with the first three causes of action alleging that the policy prohibiting overnight guests violates of the First and Fourteenth Amendments to the United States Constitution, and the fourth alleging that it violates various federal statutes and regulations. Claims five through nine are grounded in state statute and common law and are before this court

---

4. Plaintiffs allege that the salary of the security guards, who enforced the guest policy, was paid by DHS, and they point to a budget line item for "security" in the regulatory agreement governing contract subsidies received from DHS. (*See* Pl. Mem. Supp. at 29; Pl. 56.1 Statement Ex. E.) However, defendants have provided testimony that this line item did not refer to the security guards' salary, but to a budget item in the grant that was allocated to be spent on whatever security measures the Halle Defendants chose to adopt. (*See* Barany Dep. at 26; Ransom Dep. at 14.) Ed Tenhor testified that the security guards were employees of a private security company with which the Muhlenberg contracted, and that they were under his supervision. (*See* Tenhor Dep. at 24.)

on the basis of pendant jurisdiction. Although the Complaint asserts each of the causes of action against both the Halle Defendants and the Municipal Defendants, plaintiffs have withdrawn all federal constitutional claims against the Municipal Defendants. (*See* Tr. at 27.)[5]

### Discussion

#### I. Standards for Summary Judgment

Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(b). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather it must "set forth specific facts showing that there is a genuine issue for trial." *Id.* 56(e). To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### II. Federal Claims

■■ Plaintiffs' federal claims against both the Halle Defendants and the Municipal Defendants have been brought under 42 U.S.C. § 1983.[6] Liability under § 1983 requires a finding that the defendants acted under "color of state law," an element that is legally indistinguishable from the "state action" requirement of the Fourteenth Amendment. *See American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 & n. 8, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). This requirement functions to exclude "merely private conduct, however

---

**5.** "Tr." refers to the transcript of the hearing held before this court on February 23, 2001.

**6.** In order to bring an action under § 1983, "plaintiff[s] must assert a violation of a federal right, not merely a violation of federal law." *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997); *see also King v. Town of Hempstead,* 161 F.3d 112, 114 (2d Cir.1998). The plaintiffs and the Municipal Defendants dispute whether or not the federal statutes and regulations at issue in this case create a federal right entitled to enforcement under § 1983. Although the Municipal Defendants appear to have a colorable argument that the relevant statutes do not create a federal right, there is no need to resolve this issue since, as discussed below, the plaintiffs' § 1983 claims are subject to dismissal on other grounds.

The Municipal Defendants also argue that four of the five plaintiffs do not have Section 8 leases, and thus have no standing to assert the fourth cause of action. (*See* Mun. Def. Mem. Supp. at 7 n. 5.) Since it is conceded that at least one of the plaintiffs, Anibal Torres, does have standing to raise a claim under that statute, its merits are properly reached and decided as to him. As discussed below, his statutory claim, brought under § 1983, fails as a matter of law because he has not shown that defendants acted under "color of state law." It is therefore unnecessary to decide whether the other four plaintiffs have standing to assert this claim.

discriminatory" from the reach of federal law. *Id.* at 50, 119 S.Ct. 977. "Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar v. Edmondson,* 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). It also avoids the imposition of responsibility on a State for conduct it could not control. *See Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The significance of this requirement is highlighted in cases such as the present one, where plaintiffs seek to hold a private entity liable for purported state action, and the state responsible for a private actor's conduct. Whether private conduct "may be fairly treated as that of State" turns on whether there is a sufficiently "close nexus between the State and the challenged action." *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

Defendants do not contest the plaintiffs' description of the governing regulatory scheme, nor its specific application in the present context, but move for summary judgment primarily on the grounds that there is no legal basis for finding state action in this case. Plaintiffs, in contrast, argue that there is a sufficiently close nexus here because Halle Housing is subject to extensive government regulation and benefits from extensive government funding.

■ Such a close nexus may be found where the "State has so far insinuated itself into a position of interdependence with [a private entity] that it must be considered a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Government funding of a private entity, however, no matter how extensive, is insufficient to transform otherwise private conduct into state action. *See Rendell–Baker v. Kohn,* 457 U.S. 830, 840, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Similarly, "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the state," *Jackson,* 419 U.S. at 351, 95 S.Ct. 449, unless the private decision is "compelled or even influenced by any state regulation." *Rendell–Baker,* 457 U.S. at 841, 102 S.Ct. 2764; *see also Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 164–66, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). This is the case where, for example, a private actor is a "willful participant in joint activity with the State or its agents." *Lugar,* 457 U.S. at 941, 102 S.Ct. 2744 (citation omitted). On the other hand, "[m]ere approval or acquiescence [by the State] in the initiatives of a private party is not sufficient." *Blum,* 457 U.S. at 1005, 102 S.Ct. 2777. In addition, even if there is no interdependent relationship between the state and the challenged action, conduct by a private actor may still bear a sufficiently close nexus to the state if the private actor is carrying out a public function. However, the designation of a public function only applies to the "exercise by a private entity of powers traditionally exclusively reserved to the state." *Jackson,* 419 U.S. at 352, 95 S.Ct. 449. Here, the plaintiffs have presented insufficient evidence to support a finding of state action on either a "symbiotic relationship" or "public function" theory.

■ It is undisputed that the Muhlenberg is not a classic public housing project, operated directly by a state or municipal government, whose policies limiting residents' freedom of association are clearly subject to constitutional scrutiny. *Cf. Vinson v. Greenburgh Hous. Auth.,* 29 A.D.2d 338, 288 N.Y.S.2d 159 (2d Dep't 1968), *aff'd,* 27 N.Y.2d 675, 314 N.Y.S.2d 1, 262 N.E.2d 211 (1970). Plaintiffs argue, how-

ever, that Halle Housing has been "totally reliant" upon government funding both for the acquisition and rehabilitation costs of the Muhlenberg and for the rent subsidies it receives for housing low income tenants. (Pl. Mem. Supp. at 26.) Plaintiffs also point to the specifics of the regulatory scheme to which Halle Housing is subject in operating the Muhlenberg as a supportive-housing, low-income residence. They argue that because the City mandates rents, eligibility criteria for residents and the social services to be provided, and because the City pays to staff the building while retaining the right to remove managers if dissatisfied with their performance, the degree of involvement between the state and Halle Housing is "far greater" than with the typical landlord. (*Id.*) In support of their argument that *Burton* supports a finding of "state action" on the present facts, plaintiffs point to a series of New York state cases purportedly finding state action in the provision of low-income housing by regulated private entities.

Needless to say, those cases are not binding on this court,[7] and Plaintiffs have conspicuously failed to identify any recent federal case that adopts the rule of law for which they argue. In fact, governing federal cases applying *Burton* over the past

quarter century suggest a rather more restrictive view of *Burton's* scope. The Supreme Court has made it abundantly clear that even pervasively-regulated and heavily-funded private entities do not engage in state action.[8] For example, in *Blum,* plaintiff challenged a private nursing home's recommendation of a lower level of care. The plaintiff argued for state action primarily because the recommendation was based upon information contained in a form mandated by state Medicare regulations and because the state agency responsible for administering the program followed the recommendation of the nursing home physician. However, the Supreme Court found no state action since the decision to recommend a reduction in benefits was within the discretion of the treating physician and was in no way compelled by the regulations themselves.

■ Similarly, in *Rendell–Baker,* teachers at a non-profit private school for maladjusted high-school students that received nearly all of its funding from the state challenged the school's decision to terminate them. Although plaintiffs argued that their discharge constituted state action because a supervising government agency had the power to approve persons

---

7. Nor are the cases particularly persuasive, since they are easily distinguished from the facts at issue here. In the cases cited, as in *Burton,* the government had a legal interest in the property being rented to low income tenants. *See Fuller v. Urstadt,* 28 N.Y.2d 315, 321 N.Y.S.2d 601, 270 N.E.2d 321 (1971) (sublessor); *Johnson v. City of New York,* 192 A.D.2d 352, 596 N.Y.S.2d 33 (1st Dep't 1993) (owner); *512 East 11th St. HDFC v. Grimmet,* 181 A.D.2d 488, 581 N.Y.S.2d 24 (1st Dep't 1992) (right of reversion); *157 West 123rd St. Tenants Assoc. v. Hickson,* 142 Misc.2d 984, 542 N.Y.S.2d 900 (1st Dep't 1989) (owner); *Vinson v. Greenburgh Hous. Auth.,* 29 A.D.2d 338, 288 N.Y.S.2d 159 (2d Dep't 1968), *aff'd,* 27 N.Y.2d 675, 314 N.Y.S.2d 1, 262 N.E.2d 211 (1970) (owner). Consequently, these cases do not offer an expansion of *Burton's*

reasoning to cases in which the government is acting as neither property owner nor lessor, but is merely regulating and/or subsidizing a private landlord pursuant to various municipal, state and federal funding schemes.

8. Plaintiffs do cite *Male v. Crossroads Assocs.,* 469 F.2d 616 (2d Cir.1972). In that case, however, the particular project was part of a comprehensive public urban renewal plan, the land for the project had been acquired by eminent domain, and there was some evidence that the challenged policy was required by the City. *Id.* at 619 n. 1. Given the considerable change in Supreme Court authority since that case was decided, these facts are sufficient to distinguish it.

hired as vocational counselors, the court found an insufficient nexus to the challenged discharge because "in contrast to the extensive regulation of the school generally, the various regulators showed relatively interest in the school's personnel matters." *Rendell–Baker*, 457 U.S. at 842, 102 S.Ct. 2764. As these cases show, the crucial relationship for a finding of state action is between the governmental entity and the *action* taken by the private entity, not the between the governmental entity and the private *actor*. While the respective benefits and burdens flowing from government funding and regulation alone might speak to the latter, in the absence of some indication of how they shaped or compelled the challenged conduct, they simply do not speak to the former in any meaningful way.

This principle is controlling here. All the evidence provided by the plaintiffs speaks to the general relationship between the Halle Defendants and various governmental agencies. There is no dispute that the Muhlenberg has benefitted from significant amounts of government funding (close to $24 million) and that it continues to receive approximately $1 million over a three-year period in the form of contract subsidies from DHS. Nor is there any doubt that the Muhlenberg must comply with significant regulatory requirements that are overseen by the Municipal Defendants. Where plaintiffs fall short, however, is in providing evidence of the Municipal Defendants' involvement in the promulgation and enforcement of the challenged guest policies. There is simply no evidence that either HDP or DHS even knew of, let alone approved, the guest policy Defendants have provided affirmative testimony that the Policy and Procedures Manual, in which the guest policy was enumerated, was drafted solely by Ed Tenhor (*see* Tenhor Dep. at 65–66), and was never submitted to DHS for review. (*See* Mittelman Aff. ¶¶ 11, 17.) There is also affirmative testimony that neither DHS nor HDP knew of the policy. (*See* O'Hanlon Aff. ¶ 65; Mittelman Aff. ¶ 17.) Moreover, none of the § 8 leases submitted to HDP or DHS contained the disputed policy, and no other documentary evidence undermines the credibility of this testimony. (*See* O'Hanlon Aff. ¶ 56.) In fact, the sum total of the evidence of the Municipal Defendants' involvement in the promulgation or enforcement of the challenged policy is that the funds which paid for the Muhlenberg's contract with a private security service, whose employees enforced the guest policy, came from the contract subsidy provided by DHS. (*See* Pl. 56.1 Statement Ex. E; Barany Dep. at 26; Ransom Dep. at 14; Tenhor Dep. at 24.) This brings the plaintiff no closer to showing state action than evidence that the Muhlenberg received significant government funding for its general operations.

Plaintiffs have provided absolutely no evidence indicating that the challenged overnight guest policy was either compelled or influenced by the regulatory scheme under which it operated. If no state actor directly enforced the rule or was even aware of the rules, it would be improper to characterize the promulgation and enforcement of the guest policy as state action. There is thus no basis to conclude that the Halle Defendants and the Municipal Defendants were engaged in the type of purposeful joint activity that is required for a finding of state action. At most, the available evidence suggests that the Municipal Defendants acquiesced, perhaps even unwittingly, in the guest rules that Halle Defendants alone chose to promulgate. Such acquiescence is an insufficient basis upon which to base a finding of state action. *See Blum*, 457 U.S. at 1005, 102 S.Ct. 2777.

■ Nor is there any merit to plaintiffs' contention that the challenged conduct of Halle Housing constitutes state action because the provision of low-cost supportive housing is a public function. Plaintiffs predicate their public function argument upon the right to housing for the homeless assertedly secured by the New York State Constitution, which provides that "[t]he aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine." N.Y. CONST. Art. XVII § 1. As further support, plaintiffs cite New York state cases that hold the provision of low-income housing to be mandatory rather than permissive under the State Constitution. *See McCain v. Koch,* 117 A.D.2d 198, 502 N.Y.S.2d 720 (1st Dep't 1986), *modified,* 70 N.Y.2d 109, 517 N.Y.S.2d 918, 511 N.E.2d 62 (1987); *Tucker v. Toia,* 43 N.Y.2d 1, 400 N.Y.S.2d 728, 371 N.E.2d 449(1977). Defendants dispute plaintiffs' characterization of New York's constitutional law.

But even if, as plaintiffs contend and defendants dispute, New York constitutionally mandates the provision of low-cost housing for the needy, this fact alone would be insufficient to establish that the provision of low-cost housing is the traditional or exclusive preserve of the State. The public function doctrine reaches only those powers exclusively "associated with sovereignty" that are delegated to private actors. *Jackson,* 419 U.S. at 353, 95 S.Ct. 449. The doctrine thus ensures that a state cannot escape its constitutional obligations merely by delegating its sovereign powers to a private actor. Accordingly, the provision of medical care to incarcerated prisoners is a public function, even if private physicians contract with the government to provide those services. *See West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct.

2250, 101 L.Ed.2d 40 (1988). So too is the running of election primaries, even when undertaken by an ostensibly private entity. *See Terry v. Adams,* 345 U.S. 461, 484, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). On the other hand, where the government is merely a provider or regulator of services also provided by the private sector, the provision of such services does not become a public function merely by virtue of the government's participation. *See American Mfrs.,* 526 U.S. at 55–56, 119 S.Ct. 977 (medical insurer); *Blum,* 457 U.S. at 1011, 102 S.Ct. 2777 (nursing home); *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. 2764 (school); *Jackson,* 419 U.S. at 352–53, 95 S.Ct. 449 (utility). Although the State of New York has a constitutional interest in providing housing for the needy, the provision of housing, for the poor or for anyone else, has never been the exclusive preserve for the state, but has been left to a regulated, and occasionally subsidized, private marketplace.

Like education, which the New York State Constitution also requires the State to provide; *see* N.Y. CONST. Art. XI § 1, and unlike the operation of prisons, for which there is no non-sovereign analogue, housing is not a function essentially reserved for the State. The constitutional provision concerning care for the poor does not reserve the provision of low-cost public housing to the State, nor does it mandate the specific supportive-housing scheme at issue in this lawsuit (or indeed, any particular scheme of public housing). Rather, it merely authorizes (or requires) the state legislature to provide for the housing, and other, needs of the poor in whatever manner it sees fit—presumably including schemes to encourage, subsidize or regulate private landlords. Such qualified language hardly establishes the degree of exclusivity required under the pub-

lic functions doctrine.[9] The State has an obligation under its Constitution to provide its children with an education, and public schools in fact dominate the educational market, yet private schools are not thereby considered to be performing a "public function" and thus state actors, since education is not the "exclusive province of the State." *Rendell–Baker,* 457 U.S. at 852, 102 S.Ct. 2764. Surely the provision of low-cost housing is even less exclusively a governmental function.

As a matter of law, the facts adduced by plaintiffs fail to demonstrate that the challenged policy is the product of state action. Accordingly, plaintiffs' first four causes of action brought pursuant to § 1983 must be dismissed.

### III.  *State Law Claims*

Since the parties to this action are not citizens of different states, this court's jurisdiction is based solely on the federal claims asserted by the plaintiffs. Claims five through nine of the Complaint, charging defendants with violating state and municipal real property statutes, in turn, are before this court on the basis of pendant or supplemental jurisdiction. *See* 28 U.S.C. § 1367. Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over the other claims if the district court has dismissed all claims over which it has original jurisdiction." The law of this circuit generally favors declining to exercise pendant jurisdiction where the federal claims have been disposed of on summary judgment. *See Powell v. Gardner,* 891 F.2d 1039, 1047 (2d Cir.1989); *Baylis v. Mar-*

*riott Corp.,* 843 F.2d 658, 665 (2d Cir.1988); *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986); *Carnegie v. Miller,* 811 F.Supp. 907, 914 (S.D.N.Y.1993). All the federal claims having been dismissed, the remaining dispute is essentially a landlord-tenant matter that is more appropriately resolved in state court. *See, e.g., Brown v. The Resolution Trust Corp.,* 93 Civ. 7874, 1995 WL 43674, at *5 (S.D.N.Y Feb. 2, 1995) (declining to exercise supplemental jurisdiction over residual state law claims that amounted to a landlord-tenant dispute).

It may well be, as plaintiffs contend, that New York law does not permit landlords unilaterally to impose regulations, not agreed upon in the lease, governing whom a tenant may admit to leased residential units. *See La Coquille of Westhampton Beach, Inc. v. Robinson,* 48 A.D.2d 633, 368 N.Y.S.2d 195 (1st Dep't 1975); *Messiah Baptist Hous. Dev. Fund Co. v. Rosser,* 92 Misc.2d 383, 400 N.Y.S.2d 306 (County Ct. Yonkers 1977); *Edwards v. Roe,* 68 Misc.2d 278, 327 N.Y.S.2d 307 (Civ.Ct. N.Y. County 1971). But in the absence of any independent source of federal jurisdiction, it is more appropriate for the state courts of New York to address the legality of such regulations under state common or statutory law. Accordingly, this court declines to exercise jurisdiction over claims five through nine of the complaint, and they will also be dismissed.

### *Conclusion*

Plaintiffs' motion for summary judgment is denied. Defendants' motions for sum-

---

**9.** Indeed, in *Blum,* the Supreme Court rejected the argument that this same provision of the New York Constitution transformed the provision of services by a private nursing home receiving Medicare funds into a "public function" for the purposes of a state action requirement. As the Supreme Court noted, Article XVII § 1 does not exclusively obligate *the State* to provide for the medical needs of the poor or to mandate a specific means to accomplish that end. Rather, it "do[es] no more than authorize the legislature to provide funds for the care of the needy." *See Blum,* 457 U.S. at 1011, 102 S.Ct. 2777.

mary judgment are granted. Judgment will be entered for each of the defendants.

SO ORDERED.